AMERICAN TRITICALE, INC., an Idaho corporation, Plaintiff-Appellant,

v.

NYTCO SERVICES, INC., a Minnesota corporation; Steven Franz, an individual and a resident of the State of Oklahoma; J. H. Minet & Company, a Canadian corporation, authorized to do business in the United States with service agents in New York; Lloyd's Underwriters and Insurance Companies, a British corporation, authorized to do business in the United States with service agents in New York; Excess Insurance Company, Ltd., Harbor Insurance Company, Turegum Insurance Company Ltc., Union America Insurance Company, Bellefonte Insurance Company, Mentor Insurance Company, Yasuda Fire & Marine Insurance, North Atlantic Insurance Company, Insurance Company of the State of Pennsylvania, St. Paul Fire and Marine Insurance Company; various insurance companies authorized to do business in the United States with service agents in New York; Insurance Companies I through XX; John Does I through XX, Defendants-Appellees.

Nos. 80–3068, 80–3114.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1981. Decided Dec. 28, 1981.

As Amended on Denial of Rehearing Feb. 22, 1982.

Joseph M. Coughlan, Coughlan, Coughlan & Korn, Boise, Idaho, for plaintiff-appellant.

Hawley, Troxell, Ennis & Hawley, Boise, Idaho, on brief, for defendants-appellees.

Gary D. Babbitt, Boise, Idaho, for Nytco.

Christopher C. Burke, Boise, Idaho, for Steven Franz.

Before SCHROEDER and ALARCON, Circuit Judges, and HATFIELD *, District Judge.

ALARCON, Circuit Judge:

American Triticale, Inc. (hereinafter "American") appeals the district court's order of partial summary judgment for Nytco Services, Inc. (hereinafter "Nytco") and Steven Franz on several counts in American's third amended complaint.[1] In granting partial summary judgment the court concluded that: (1) American was not the real party in interest pursuant to Fed.R. Civ.P. 17(a)[2] and, therefore, was not the proper party to maintain the action; (2) American had agreed contractually to indemnify Nytco against the losses alleged in the suit; and (3) the action was barred by the doctrines of res judicata and collateral estoppel. The district court had jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332 (1976). For the reasons stated below we reverse the judgment of the district court.

### I.

### FACTUAL BACKGROUND

On February 1, 1974, American, an Idaho corporation with its principal place of business in Idaho, and Nytco, a Minnesota corporation authorized to do business in Oklahoma, entered into a contract for the "field warehousing"[3] of American's grain at a warehouse facility in Turpin, Oklahoma. The purpose of this field warehousing arrangement was to secure a portion of American's grain inventory as collateral for a $750,000 commercial line of credit which American sought from the Irving Trust Company (hereinafter "Irving Trust"), a New York banking corporation.

The contract consisted of several documents[4] which, collectively, enumerated the

---

* Hon. Paul G. Hatfield, United States District Judge for the District of Montana, sitting by designation.

1. The district court granted separate motions for summary judgment; one on behalf of defendants Nytco and Steven Franz, and the other on behalf of the eleven defendant insurance companies. American appealed separately from both judgments, and those appeals were subsequently consolidated. Although summary judgment was not granted as to all of the counts of the amended complaint, there is a final judgment from which an appeal may lie. Pursuant to Fed.R.Civ.P. 54(b) the court determined that there was no just reason for delay in entering final judgment upon the orders granting partial summary judgment.

2. Fed.R.Civ.P. 17(a) provides:
   Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and

such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

3. Field warehousing is a commercial contractual arrangement among borrower, warehousemen and lendor. The purpose of the arrangement is to secure a percentage of the borrower's inventory as collateral for a specified working capital line of credit from the lender. The borrower leases a part of his premises to a bonded warehouseman for nominal rent. In turn, the warehouseman stores the borrower's inventory upon the borrower's premises, takes out loss insurance on the stored goods, supplies its presence and inventory controls and issues warehouse receipts to the lender as collateral upon the borrower's loan. The borrower's employees usually perform the physical labor necessary to store the goods, although the warehouseman and borrower agree that these workers are technically the employees of the warehouseman. Upon retirement of the debt the borrower is able to redeem the outstanding warehouse receipts. In short, a field warehouse arrangement is created not to aid the borrower in storing its inventory as in a terminal warehouse arrangement, but to secure and protect a creditor in its extension of credit to the borrower. *See generally,* J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 20–5, pp. 823–827 (2d ed. 1980).

4. The contract consisted of a lease, "Warehouse Agreement," and "Supplemental Agreement" between American and Nytco and a

duties and responsibilities of the parties. American agreed to sublease to Nytco certain storage facilities in Turpin, Oklahoma, which American had leased from Howard and Dorothy Franz. Nytco agreed to operate a public warehouse at those facilities, accept the grain deposited for storage by American, and issue warehouse receipts covering that grain to Irving Trust. American agreed to undertake the daily operation of the warehouse, supply the labor necessary for the handling, storage, and safekeeping of the grain and bound itself to pay a schedule of storage charges to Nytco.[5] American also agreed to "indemnify and hold harmless [Nytco] from any financial loss or any other loss, damage, claim, legal liability or expense resulting directly or indirectly from any of the acts of [American], its officers, agents or employees . . . ."[6]

In exchange for non-negotiable warehouse receipts issued upon American's grain stored at the Oklahoma warehouse, Irving Trust provided American with a $750,000 line of credit. American actually borrowed $450,000 of this line but defaulted on repayment of the loan. Consequently, Irving Trust filed suit for repayment in the United States District Court for the Southern Dis-

trict of New York on June 10, 1975, and obtained a judgment on September 8, 1976.

On April 1, 1975, Howard and Dorothy Franz, the owners of the Oklahoma warehouse, filed a petition in the district court of Beaver County, Oklahoma, against American and Nytco for failure to pay rent. They sought attachment of the grain stored in the warehouse as satisfaction for the judgment. Nytco answered the petition, denying generally the allegations in the complaint and cross-claimed, seeking to restrain the Franzes from interfering with the possession of the stored grain. Nytco also interpleaded Irving Trust as holder of the warehouse receipts.

American answered and cross-claimed against Howard and Dorothy Franz. It denied generally the allegations in the complaint, alleged that the Franzes defrauded American and converted large amounts of stored grain worth more than $755,000, and demanded an accounting. Irving Trust appeared and contested any attempt to cancel the warehouse receipts.

On May 23, 1979, the Beaver County District Court entered a judgment which dismissed the claims of Howard and Dorothy Franz and those of American for failure to

---

"Commodity Servicing Agreement" among American, Nytco and Irving Trust.

5. It was also agreed that if any Nytco employee who was a "bonded agent" performed the labor necessary for the handling or storage of the grain, that employee would be considered to be an employee of American, regardless of the immediate source of that employee's compensation.

6. Collectively, the agreements contained at least three provisions in which American agreed to indemnify Nytco for liability resulting from the warehousing arrangement.

The Supplemental Agreement provided in part:

Referring to the Field Warehouse Arrangements which are to be consummated between [Nytco] and [American] and to the storage contract and leases which are part of said arrangements, we, the undersigned, as officers, agents, directors, or shareholders, interested in [American] obtaining the benefits of [Nytco] hereby jointly and severally, personally and individually, agree to indemnify and hold harmless [Nytco] from any financial loss or any other loss, damage, claim, legal liability or expense resulting directly or indirectly from any of the acts of [American],

its officers, agents, or employees, whether such acts shall be consummated directly or in conveyance with others * * *."

The lease for the warehouse facilities provided, in part, that American would:

protect, indemnify, and hold harmless [Nytco] against all claims for loss, damage or shortage of any kind or nature to the property deposited therein, or thereon, which may occur or take place through the failure of [American] to maintain such repairs, order and proper temperature, or from any other cause whatsoever.

The Commodity Servicing Agreement provided in part:

[I]ncident to the warehousing of the commodities contemplated [in the Warehouse Agreement] [American] retains responsibility for grading, drying, treating, turning, disinfecting, and all acts and services necessary for the protection and preservation of the commodities warehoused, and desires to use his or its own employees in connection therewith, and [American] desires to indemnify and hold harmless [Nytco] against all claims, demands, penalties or liabilities of any nature arising out of the foregoing * * *."

appear. The remaining claims were dismissed upon stipulation of the Franzes, Nytco and Irving Trust. Furthermore, it was stipulated by those same parties that Irving Trust was entitled to receive all funds derived from a judicial sale of the grain at the Oklahoma warehouse.[7]

American instituted the present action in the United States District Court for the District of Idaho on February 18, 1976. In its third amended complaint American sought punitive damages and alleged that Nytco and Steven Franz: (1) negligently and intentionally lost or permitted to be removed substantial portions of the stored grain; (2) refused to account for the grain and overcharged American for storage; (3) negligently and in breach of contract permitted American's grain to be co-mingled and rendered unfit for seed purposes; and (4) interfered with an advantageous business relationship. American also alleged that subsequent to the discovery of the grain losses, Steven Franz purchased the remaining grain in breach of his fiduciary duty to American. Nytco and Steven Franz moved for partial summary judgment on May 29, 1979. On October 16, 1979, the district court granted partial summary judgment for Nytco and Franz from which American now appeals.

## II.

### REAL PARTY IN INTEREST

The district court concluded that pursuant to Article 7 of the Uniform Commercial Code, (hereinafter "U.C.C."), title to the grain accompanied transfer of the non-negotiable warehouse receipts and was held by Irving Trust.[8] The court held that American was not a real party in interest and could not maintain an action against Nytco or Franz for alleged breach of the field warehousing agreement or tortious conduct involving the stored grain.

■ Whether American is the real party in interest under Fed.R.Civ.P. 17(a) in this federal diversity suit is dependant upon whether American is a proper party to maintain this action under applicable state law. *See Peters v. Lines,* 275 F.2d 919, 928 (9th Cir. 1960); *Iowa Public Service Co. v. Medicine Bow Coal Co.,* 556 F.2d 400, 404 (8th Cir. 1977); *Virginia Electric & Power Co. v. Westinghouse Electric Corp.,* 485 F.2d 78, 83 (4th Cir. 1973); 6 C. Wright and A. Miller, Federal Practice & Procedure § 1544, p. 647 (1971). It is well settled that a federal court exercising diversity jurisdiction must apply substantive state law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Motschenbacher v. R. J. Reynolds Tobacco Co.,* 498 F.2d 821, 823 (9th Cir. 1974).

■ Although this action was filed in the Federal District Court in Idaho, the complaint alleges a breach of contract to be performed in Oklahoma and tortious actions which, if true, occurred in Oklahoma. Well-established principles of jurisprudence require that a federal court exercising diversity jurisdiction must apply the conflict-of-laws-rules of the state in which the federal court is located when the laws of more than one jurisdiction arguably apply to the issue to be decided. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Sarlot-Kantarjian v. First Pennsylvania Mortgage Trust,* 599 F.2d 915, 917 (9th Cir.

---

7. All Triticale grain held in storage at the Turpin storage facility was sold at public auction under the direction of a Beaver County court-appointed receiver. Steven Franz submitted the highest bid in the amount of $29,886.20. After satisfaction of costs incurred in the sale, Irving trust received $26,757.74.

8. Both Idaho and Oklahoma have adopted the Uniform Commercial Code. *See* Idaho Code §§ 28 1–101 to 28–10–104; 12A Okla.Stat. §§ 1–101 to 10–104. Section 7–504(1) of the

U.C.C., Idaho Code § 28 7–504, 12A Okla.Stat. § 7–504, provides:

A transferee of a document, whether negotiable or non-negotiable, to whom the document has been delivered but not duly negotiated, acquires the title and rights which his transferor had or had actual authority to convey.

The U.C.C. defines a "document" as a "document of title" which includes, inter alia, a warehouse receipt. Idaho Code §§ 28 7–102(3), 28 1–201(15); 12A Okla.Stat. §§ 7–102(3), 1–201(15).

1979); *Strassberg v. New England Mutual Life Insurance Co.*, 575 F.2d 1262, 1263 (9th Cir. 1978).

We are thus required to consult Idaho conflict-of laws-rules to decide whether the law of Idaho or Oklahoma applies to the question of whether American is a proper party to maintain this suit. We are unaware of any Idaho law which provides an appropriate conflict-of-laws rule with respect to causes of action sounding in contract or tort which arise in a foreign state. We therefore apply general choice of law principles to determine which state's law governs in this situation. *See Commercial Insurance Co. of Newark v. Pacific-Peru Construction Corp.*, 558 F.2d 948, 952 (9th Cir. 1977); *Dashiell v. Keauhou-Kona Co.*, 487 F.2d 957, 960 (9th Cir. 1973) (absent appropriate state law, the Restatement (Second) of the Conflict of Laws provide guidance as to general conflicts principles). Under Section 196 of the Restatement (Second) of the Conflict of Laws (1971),[9] we apply Oklahoma law to determine whether American has the right to maintain a suit against Nytco and Franz because Oklahoma is the situs of the warehouse facilities where the contract was to have been performed. Similarly, under Section 147 of the Restatement,[10] we apply Oklahoma law to the question of whether American may maintain an action against Nytco and Franz for alleged tortious conduct involving storage of the grain because any intentional or negligent loss of or damage to the grain occurred, if at all, at the Oklahoma warehouse.

In analyzing whether American could maintain this action under state law, the district court recognized that some jurisdictions permit an assignor to remain a real party in interest capable of suing on its own behalf if an assignment of title to the underlying goods has been made to provide a lender with security. *See* 3A J. Moore, Federal Practice, ¶ 17.09[1.1] (2d ed. 1979). The court concluded, however, that based upon *Marker v. Gillam*, 54 Okl. 766, 154 P. 351 (1916), Oklahoma was not one of those jurisdictions. We believe that the court erred in its interpretation of Oklahoma law.

In *Gillam*, George Marker and Francis Garretson contracted for the sale of Marker's land, the conveyance of which was to occur two years later. Shortly after signing the land-sale contract with Marker, Garretson assigned his right under this agreement to Gillam as security for the faithful performance by Garretson of his promise to construct a residence for Gillam. Gillam, as assignee of the land-sale contract, sued Marker for breach of contract when the latter sold the property to another person prior to the conclusion of the two-year period. Gillam prevailed in the trial court. On appeal Marker argued, *inter alia*, that as assignor of the contract, Garretson was a necessary party to a suit for breach of that contract. The Oklahoma Supreme Court disagreed. In affirming the judgment of the lower court, the Supreme Court held that Garretson was not a necessary party to the action instituted by Gillam, the assignee, because Gillam was the owner of the contract of sale until full completion of the building. In the instant case the district court construed the holding of *Gillam*

---

**9.** Section 196 of the Restatement (Second) of the Conflict of Laws (1971) provides:

The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which the event the local law of the other state will be applied.

**10.** Section 147 of the Restatement (Second) of the Conflict of Laws (1971) provides:

In an action for an injury to land or other tangible thing, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied.

as compelling it to hold that an assignor of goods for security is precluded from maintaining an action against a warehouseman for alleged loss of or damage to the collateral. We believe that the district court erred in so broadly construing *Gillam.*

■ The Supreme Court of Oklahoma simply did not address the issue of whether one who assigns the title to his property to another as security may maintain an action against a third person for loss of or damage to the assigned property. Nor have the parties been able to point to any Oklahoma Supreme Court decision which directly addresses that issue. Absent such authority, a federal court is obligated to follow a decision of the Oklahoma Court of Appeals "in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.,* 311 U.S. 464, 467, 61 S.Ct. 336, 337, 85 L.Ed. 284 (1940); *see Community National Bank v. Fidelity & Deposit Co. of Maryland,* 563 F.2d 1319, 1321 n.1 (9th Cir. 1977).

Although we are unaware of an Oklahoma Court of Appeals decision which has addressed specifically the question at issue, i. e., transfer of field warehouse receipts, that court has addressed an issue so close on point that we find it to be dispositive of the question in the instant case.[11] In *Kellenberger v. Bob Meyers Moving & Storage Co.,* 595 P.2d 1229 (Okl.App.1979), the plaintiff stored personal household goods, including furniture, appliances and clothing with a storage company. When Ms. Kellenberger failed to pay storage fees for eight months, the Company notified her that her property would be sold at public auction if her account was not settled by a specified date. Kellenberger thereafter borrowed sufficient funds from a friend and executed an agreement whereby she "sold or assigned" all of her "rights and ownership" in the property to her friend. The agreement provided that "[a]ll future storage and expenses [are] to be paid by the purchaser until satisfactory settlement is made in full,

at which time ownership [in the warehoused goods] reverts to Janie E. Kellenberger." 595 P.2d at 1231.

After the storage company refused to accept payment of the tardy fees and sold her property, Ms. Kellenberger instituted an action for conversion against the company. The trial court found for the company and Ms. Kellenberger appealed. On appeal the company contended that Kellenberger was not the real party in interest in the lawsuit because the agreement which she executed affected a transfer to her friend of all of her rights and ownership in the stored property until she repaid the loan. The Oklahoma Court of Appeals reversed the judgment of the trial court. The appellate court held that the plaintiff was the real party in interest and was entitled to prosecute the action because the agreement between Kellenberger and her friend "was not to sell the goods, but rather merely to grant a security interest in them to the plaintiff's friend. (citations omitted)." 595 P.2d at 1231.

■ In the instant case, none of the parties contend that the purpose of the field warehousing arrangement was to provide for a sale of the grain from American to Irving Trust. Indeed, Nytco and Franz concede that the purpose of the arrangement was to provide security to Irving Trust for the line of credit it offered to American. Nytco and Franz contend, however, that notwithstanding the secured transaction between Irving Trust and American, Article 7 of the Uniform Commercial Code provides that the non-negotiable warehouse receipts issued to Irving Trust transferred title and rights in the underlying grain to the bank.[12] They assert that a warehouseman owes its obligation and duty of safekeeping only to the holder of the warehouse receipts. Accordingly, Nytco and Franz maintain that the district court was correct in its conclusion that Irving Trust was the entity to whom delivery of the grain was to be made and that only

---

**11.** We also are unconvinced that the Oklahoma Supreme Court would decide the issue differently.

**12.** 12A Okla.Stat. § 7–504. *See* n. 8, *supra.*

Irving Trust had the right to sue Nytco for non-delivery, loss or damage to the grain.

American contends that the district court erred. American characterizes the agreement between itself and Irving Trust as a pledge of inventory grain as collateral for a commercial line of credit. It asserts that Article 9 of the U.C.C., which governs the creation and perfection of security interests in documents of title and in goods, is applicable to the field warehousing arrangement because that arrangement is a secured transaction.[13] American argues that under Article 9 it would remain the real party in interest regardless of the transfer of title.[14] We believe that American's position is consistent with Oklahoma law.

In *Kellenberger*, the Oklahoma Court of Appeals cited 12A Okla.Stat. § 9–102(2) as authority for its holding that Ms. Kellenberger remained a real party in interest even though she transferred title in the warehoused goods to her lender to provide him with security. Although we recognize the differences in the underlying purposes between a field warehousing arrangement and the storage agreement which existed in *Kellenberger*, we do not find those differences to be of material significance.[15] In both *Kellenberger* and the instant case, transfer of title to goods occurred to provide a lender with security for a loan. In each case the debtor, who had transferred title in the collateral to the creditor, alleged that the warehouseman unlawfully converted the collateral. Although technically both the creditor in *Kellenberger* and in the instant case held title to the goods, the debtor in each case maintained a substantial interest in those goods.

We find unpersuasive the argument of Nytco and Franz that Article 7 of the Uniform Commercial Code precludes the suit in the instant case. Article 7 does provide that a warehouseman is liable to "a party to ... a document of title ... for damages caused by the nonreceipt or misdescription of the goods." 12A Okla.Stat. § 7–203.[16] That Article also provides that a ware-

---

**13.** 12A Okla.Stat. § 9–102 provides:

(1) Except as otherwise provided ... this chapter applies so far as concerns any personal property and fixtures within the jurisdiction of this state
    (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts; and also
    (b) to any sale of accounts or chattel paper.
(2) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security ...
(3) The application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply.

**14.** American argues alternatively that even if Irving Trust is the owner of the grain and the only real party in interest under Article 7 of the U.C.C., American may sue Nytco and Franz for contractual breaches of the warehousing agreement and for tort claims arising from storage of the grain if those causes of action do not require ownership or possession of the grain as an element of proof. Because we conclude that American is a real party in interest we need not address that alternative argument.

**15.** A field warehousing arrangement exists to effectuate a transfer of title in the underlying commodity from the debtor to the creditor to provide the creditor with security for a loan. *See* n. 3, *supra*, and accompanying text. A storage warehousing arrangement, in contrast, exists to provide a repository for goods; transfer of title to those goods is not contemplated nor provided for in the agreement.

**16.** 12A Okla.Stat. § 7–203 provides:

A party to or purchaser for value in good faith of a document of title other than a bill of lading relying in either case upon the description therein of the goods may recover from the issuer damages caused by the nonreceipt or misdescription of the goods, except to the extent that the document conspicuously indicates that the issuer does not know whether any part of all of the goods in fact were received or conform to the description, as where the description is in terms of marks or labels or kind, quantity or condition, or the receipt or description is qualified by "contents, condition and quality unknown," "said to contain" or the like, if such indication be true, or the party or purchaser otherwise has notice.

houseman has a duty to exercise reasonable care in the storage of goods. 12A Okla. Stat. § 7–204.[17] We are unable to find any Oklahoma authority, however, for the proposition that a field warehouseman owes a duty of care only to the creditor to the exclusion of the debtor. Nor does the Article by it terms preclude a suit by the debtor against the warehouseman. Indeed, the "Comment to Official Text" following 12A Okla.Stat. § 7–101 states: "[t]he Article [Chapter] does not attempt to define the tort liability of bailees, except to hold certain classes of bailees to a minimum standard of reasonable care. For important classes of bailees, liabilities in case of loss, damage or destruction, as well as other legal questions associated with particular documents of title, are governed by federal statutes, international treaties, and in some cases regulatory state laws, which supersede the provisions of the Article [Chapter] in case of inconsistency."

Conversely, Article 9 applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts." 12A Okla.Stat. § 9–102. The Official Comment to that section provides that Article 9 "sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures..." Furthermore, the Comment states, "[t]his Article [9] does not determine whether 'title' to collateral is in the secured party or in the debtor and adopts neither a 'title theory' nor a 'lien theory' of security interests. *Rights, obligations and remedies under the Article do not depend on the location of title.*" (Emphasis added). The principal test whether a transaction comes under Article 9 is whether the transaction is intended to have effect as a security interest. 12A Okla.Stat. § 9–102, Official Comment. Given the material similarities between *Kellenberger* and

the instant case, the fact that the *Kellenberger* court allowed the assignor of title for security to maintain the action under Article 9 against the warehouseman, and the fact that the Uniform Commercial Code as adopted in Oklahoma does not specifically preclude such a suit, we conclude that Oklahoma law would permit American to maintain this action against Nytco and Franz. Consequently, American is a real party in interest pursuant to Fed.R.Civ.P. 17(a).

### III.

### INDEMNITY

The district court also granted summary judgment to Nytco and Franz on the basis that American had agreed to indemnify Nytco against liability for the alleged losses pursuant to several indemnity clauses in the written warehousing agreement.[18] American contends that those indemnity clauses do not prevent it from suing Nytco and Franz for intentional tortious conduct such as conversion. Nytco and Franz assert that the parties contemplated that all storage functions would be performed by American and that the agreements provided that American had responsibility for protecting and safekeeping the stored grain. Furthermore, Nytco argues that American agreed to indemnify Nytco for any liability and agreed that persons performing the storage and safekeeping functions would be deemed to be agents of American. Nytco asserts that if any conversion was committed by Stephen Franz, liability would not fall upon Nytco because, pursuant to the agreement, Franz was American's agent.

Franz asserts that he was an employee and agent of Nytco, not American. He argues that he was never a regular employee of American, had never previously been employed as a field warehousing manager, and was specifically hired by Nytco. Franz contends that the broad indemnity provisions of the warehousing agreement which

---

**17.** 12A Okla.Stat. § 7–204(1) provides:
A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless

otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

**18.** *See* n. 6, *supra.*

protect Nytco also insulate him from liability as Nytco's agent. We believe that the district court erred in granting summary judgment to Nytco and Franz on the basis of indemnification.

We recognize that the indemnity provisions are broad and extensively protect Nytco from all liability. In *Page v. Allison*, 173 Okl. 205, 47 P.2d 134 (1935), the Oklahoma Supreme Court held that a warehouseman could not limit its liability for goods which had been deposited and unlawfully converted.

■ In the instant case the parties agreed that Nytco would be held harmless for "all liability" arising out of the warehousing agreement. Such a provision has a significant business purpose in protecting the warehouseman from liability for damage to or loss of the grain that might be occasioned by American, who had primary responsibility for the storage and handling of the grain. We cannot support the suggestion, however, that Nytco, as the warehouseman, is to be held harmless for intentional torts, including conversion, which it allegedly committed. The risk of loss of or damage to the stored grain from fire, water, natural catastrophe or even negligence can be considered to be within the ordinary contemplation of the parties when they negotiated the indemnity protection for Nytco. Because the indemnification clause does operate to protect Nytco from liability for negligent harm, the granting of summary judgment as to negligence claims in the complaint alleging such harm was proper. Nothing in the agreement, however, supports the conclusion that an intentional conversion by Nytco was intended to be an object of indemnity.[19] We conclude that the indemnity provision in the warehousing agreement does not protect Nytco from liability for intentional torts involving the stored grain.

■ We also believe that the district court erred in granting summary judgment

to Stephen Franz. American and Franz contend that Franz is an employee and agent of Nytco. Nytco contends that Franz is an employee and agent of American. At this stage of the proceedings the nature of Franz's employment relationship is a genuine issue of material fact for which summary judgment is inappropriate. *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 63 (9th Cir. 1973); Fed.R.Civ.P. 56(c).

## IV.

### RES JUDICATA AND COLLATERAL ESTOPPEL

As a third ground for granting summary judgment to Nytco,[20] the district court concluded that the doctrine of res judicata precluded American from maintaining this action because of the previous litigation in the district court of Beaver County, Oklahoma. We believe that the district court was in error.

■ The related doctrines of collateral estoppel and res judicata form a fundamental precept that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897); see *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The doctrine of res judicata provides that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Montana v. United States, supra*, 440 U.S. at 153, 99 S.Ct. at 973; *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955); 1B J. Moore, Federal Practice ¶ 0.405[1], pp. 621–624 (2d ed. 1980); Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, Mar. 28, 1973) (merger); *id.*, § 48 (bar). A judgment in a previous suit is

---

19. We express no opinion whether an indemnity provision which expressly protected a warehouseman from liability for intentional torts relating to the stored commodity would be void as against public policy.

20. Steven Franz did not join in the motion for summary judgment on this ground.

conclusive in a second suit between the same parties or their privies on the same cause of action not only of matters actually litigated but also as to every other ground which the parties might have litigated incident to and within the rubric of the subject matter of the first suit. *Mirin v. State of Nevada ex rel. Public Service Commission*, 547 F.2d 91, 94 (9th Cir. 1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977); *Scoggin v. Schrunk*, 522 F.2d 436, 437 (9th Cir.), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 807, 46 L.Ed.2d 657 (1975).

To determine if application of res judicata is appropriate in the instant case, we must scrutinize the Beaver County, Oklahoma, litigation and inquire whether the same parties or their privies are attempting to relitigate the same cause of action in the instant case. Whether a person was a party to the prior suit must be determined as a matter of substance and not of mere form. "The essential consideration is that it is the right of the [same person] which was presented and adjudicated in both courts." *Chicago, R. I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757 (1926); 1B J. Moore, Federal Practice ¶ 0.411[1], p. 1253 (2d ed. 1980).

A review of the record demonstrates that although American and Nytco were parties to the Oklahoma suit, they were both defendants to the action filed by Howard and Dorothy Franz; neither American nor Nytco filed a cross-claim against the other.[21] Accordingly, there was no adjudication of a cause of action between those parties. Res judicata, therefore, is inapplicable to the present action because there was no adjudication between the same parties on *any* cause of action let alone the same cause of action. *See Montana v. United States, supra*, 440 U.S. at 153, 99 S.Ct. at 973.

The doctrine of collateral estoppel provides that a determination of an issue actually and necessarily determined by a court of competent jurisdiction is con-

clusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Montana v. United States, supra*, 440 U.S. at 153, 99 S.Ct. at 773; Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Nytco contends that the issue of shortages, conversion and breach of duty which are raised in the instant suit, were raised by American in its cross-claim against Howard and Dorothy Franz and adjudicated against American in the Oklahoma suit. Nytco argues that even though the issue of Nytco's culpability for shortages, conversion and breach of duty was not raised by American previously, the fact that American raised the issue in the Oklahoma litigation, albeit with respect to Howard and Dorothy Franz, "necessarily negatives" the claims raised by American in the instant action. We find Nytco's argument unpersuasive.

Even though the issues raised by American in its cross-claim against Howard and Dorothy Franz were adjudicated, we see nothing in that judgment which adjudicated the issue of whether Nytco was responsible for shortages, conversion or breach of duty. If the Oklahoma court had made a finding that no conversion or shortages occurred at all, Nytco could arguably utilize the doctrine of collateral estoppel to prevent relitigation of that issue in a suit by American which alleged that Nytco unlawfully converted the grain. The Oklahoma court made no such finding, however. The most that can be said of the judgment in that case is that Howard and Dorothy Franz did not unlawfully convert the grain. The issue of whether any grain was unlawfully converted or any shortages occurred has not yet been determined.

Nytco also contends that the litigation between Irving Trust and American in the United States District Court for the Southern District of New York precludes

---

**21.** In *Meyer v. Vance*, 406 P.2d 996 (Okl.1965), the Oklahoma Supreme Court held that counterclaims are permissive in Oklahoma, not compulsory. Failure to assert a counterclaim, therefore, does not generally bar the claim at a later time.

the instant suit on the basis of res judica-ta.[22] We disagree. In the New York litigation, Irving Trust sued American for default of American's obligation to repay the $450,000 which it had borrowed from Irving Trust. Neither Nytco nor Steven Franz was a party to that litigation. Res judicata, therefore, does not prevent American's present suit against Nytco and Steven Franz because the instant suit is not a second suit between the same parties or their privies on the same cause of action. *See Montana v. United States, supra,* 440 U.S. at 153, 99 S.Ct. at 973.

We also reject Nytco's contention that American is barred by the doctrine of collateral estoppel from asserting damage claims against Nytco. Nytco argues that American was obligated to present allegations of losses of or damage to the grain by way of a compulsory counterclaim under Fed.R.Civ.P. 13(a)[23] in the New York litigation. Nytco maintains that failure to assert this counterclaim precludes the assertion of these claims in the instant case.

Rule 13(a) requires a defendant to file a counterclaim against any "opposing party" if the claim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. In the New York litigation, Irving Trust was the only opposing party for purposes of deciding whether a counterclaim was mandatory because Irving Trust was the only party which had submitted itself to the jurisdiction of the Federal District Court. *See* 3 J. Moore, Federal Practice, ¶ 13.06 (2d ed. 1980). Neither Nytco nor Franz was a party to that suit and the court had no jurisdiction over them. Furthermore, the alleged breach of contract and tortious conduct of Nytco and Franz was not related to American's default of its loan obligation to Irving Trust, which was the subject matter of the New

York litigation. Because American was not obligated to make a compulsory counterclaim in the New York litigation with respect to the issues involved in the instant case, we will not construe the New York litigation to have adjudicated those issues. We thus conclude that collateral estoppel does not prevent the present suit by American against Nytco.

Summary judgment in favor of the defendant insurance companies as to County VII of the amended complaint is affirmed. Summary judgment in favor of Nytco and Steven Franz on the negligence allegations of the complaint is also affirmed. Summary judgment as to the allegations of intentional torts is reversed and remanded for further proceedings.

---

22. The district court in the instant case failed to address the issue of whether the suit brought by Irving Trust against American in the United States District for the Southern District of New York precluded the present action on the basis of the doctrines of res judicata or collateral estoppel. We address that issue here because the parties raised it in their motion for summary judgment before the district court.

23. Fed.R.Civ.P. 13(a) requires a defendant to plead any counterclaim which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."