**HORSELL GRAPHIC INDUSTRIES, LTD., Plaintiff,**

v.

**VALUATION COUNSELORS, INC., Valuation Counselors Central, Inc., John R. Holmes and William Raidt, Defendants.**

No. 85 C 9036.

United States District Court, N.D. Illinois, E.D.

July 15, 1986.

Lawrence S. Samuels, Alan M. Posner, Jacquelyn F. Kidder, Sonnenschein Calin Nath & Rosenthal, Chicago, Ill., for plaintiff.

N. Rosie Rosenbaum, McDermott, Will & Emery, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Horsell Graphic Industries, Ltd. ("Horsell") contracted to purchase its partner's stock in a distribution company which sells plaintiff's products in the United States, for a price to be set by an appraisal firm. Defendant Valuation Counselors, Inc. was the chosen firm. It issued a valuation report which plaintiff alleges overstated the value of the stock by more than $2 million. Horsell, bound by the contract with its partner, settled for a somewhat lower purchase price in an action brought by its partner on the purchase contract. Having suffered what it considers a sizable loss, Horsell now turns to the party it claims caused the loss and sues.[1] The complaint charges breach of the appraisal contract (count I), negligence, misrepresentation and fraud (counts II, III and IV, respectively), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½ § 262 et seq. (count V), securities fraud (count VI), and violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq. (counts VII and VIII).

Before the court is defendants' motion to dismiss all counts. The defendants make two attacks on the suit as a whole. First, they argue that this suit is barred by the prior suit between Horsell and its partner on the purchase contract and, if not barred, the issue of their conduct in performing the appraisal is collaterally estopped. Second, they argue that they are entitled to immunity because of their role as "arbitrators." The defendants also argue that each count lacks a sufficient basis (whether in law or fact) upon which to make a claim. The court, having reviewed each of defendants' arguments, concludes that their motion to dismiss is granted on counts V and VI,

---

1. Defendants other than Valuation are its local affiliate (Valuation Counselors Central); the affiliate's president (John Holmes) and one of its appraisers (William Raidt). Plaintiff claims Valuation and Valuation Counselors Central together performed the appraisal.

granted with leave to amend on counts VII and VIII, and denied on all other counts.

## I. Arbitral Immunity

■ Defendants attempt to characterize themselves as arbitrators in the dispute between Horsell and its partner, by lumping "arbitrators" and "appraisers" under the same category and then citing cases which uphold immunity for arbitrators. However, such a semantic maneuver does not survive scrutiny of the parties' intentions and the case law distinguishing arbitrators from appraisers.

Looking at the parties' intentions, the defendants stated in a letter to Horsell on July 30, 1984:

> In accordance with your ... request, we have conducted appraisal services ... in accordance with standard appraisal practices.

The complaint consistently refers to defendants as "appraisers" and never mentions arbitration, indicating plaintiff's understanding. Further, in the same letter quoted above, defendants stated:

> We have been charged with a very difficult assignment. The fulfillment of our responsibilities to the parties has been severely impeded by the circumstances. A proper valuation of the business would involve our independent judgment on a wide variety of matters on which our capability and competence is limited. These matters include but are not limited to: the intent of the parties; the legal and the fiduciary relationships of the parties; and the reliability of the representations of management.

■ Independent judgment is the cornerstone of the arbitrator's position. *Allied Contracting Company of Illinois v. Bennett*, 110 Ill.App.3d 310, 315, 66 Ill.Dec. 54, 57, 442 N.E.2d 326, 329 (4th Dist.1982). In a similar case, where the plaintiff sued an accounting firm charging fraud and negligence in the making of a report to which plaintiff was contractually bound, the court stated:

> In most of these cases judicial immunity was held dependent upon some contractual provision which called for the exercise of independent judgment or discretion by a person acting as an arbitrator and which made his determinations binding upon the parties selecting him. But in the absence of such contractual provisions, or where the agreement does not call for the exercise of judicial authority, ordinarily the person selected to perform skilled or professional services is not immune from charges of negligence and is required to work with the same skill and care exercised by an average person engaged in the trade or profession involved.

*Gammel v. Ernst & Ernst*, 245 Minn. 249, 72 N.W.2d 364, 368 (1955). As in *Gammel*, we will not imply an attempt to arbitrate—which would switch all disputes off the judicial track—without a clear and express arbitration agreement. *See also Flood v. Mutual Insurance Company*, 41 Ill.2d 91, 94, 242 N.E.2d 149, 151 (1968); *Corey v. New York Stock Exchange*, 691 F.2d 1205, 1211 (6th Cir.1982) ("arbitration as the contractual choice of the parties is respected").

Moreover, an objective view of the role defendants performed precludes a finding that they acted as arbitrators:

> The terms "appraisement" and "arbitration" are sometimes used interchangeably and frequently without any clear difference in meaning. There is, however, a plain distinction between an appraisement and an arbitration. The latter, in the proper sense of the term, presupposes a controversy or a difference to be tried and decided. Arbitrators generally proceed in a *quasi* judicial manner to settle the dispute. The jurisdiction is in the nature of a judicial inquiry and certain rules of procedure must be observed or the award will be void. On the other hand, an appraisal is the proper term to be used when an appraisement or valuation is to be made as auxiliary or incident to a contract.... Unless there are some restrictions in the agreement under which they are appointed, appraisers are generally expected to act on their own knowledge and investigation and hence are not required to give

notice of the hearings, hear evidence or receive the statements of the parties. *Sebree v. Board of Education,* 254 Ill. 438, 446, 98 N.E. 931 (1912).[2] While defendants did receive information from Horsell (complaint, ¶¶ 16, 18), this alone cannot transform their role into that of arbitrator because none of the other indicia of such status exists. Therefore, the court cannot give defendants arbitral immunity.

## II. The Effect of the Prior Decision

█ Defendants argue that plaintiff cannot litigate the issues of their performance because of the prior suit between Horsell and its partner for payment on the purchase contract. The prior suit was brought by Horsell's former partner, Graphic Industries of America, Inc. ("GIA") and its president, James A. LaGrippe, against Horsell, on the purchase contract. That agreement provided that the price Horsell would pay GIA for its shares in the partnership, and the amount Horsell would pay LaGrippe in consideration for the termination of his employment, would be set by an appraisal firm. The agreement stated that the firm's valuation "shall be binding upon all parties." Horsell vigorously objected to the defendants' appraisal report when it was issued. However, realizing that it was contractually bound to pay GIA and LaGrippe, Horsell settled the suit with them for roughly $1.7 million more than it claims their interest was actually worth.

Now, Horsell is suing defendants for breach of contract and duty with respect to that report. In order for the prior suit to preclude this one "[t]here must be identity of parties or privies." *McVeigh v. McGurren,* 117 F.2d 672, 678 (7th Cir.), *cert. denied* 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531 (1941). *See also Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 301 (7th Cir.1985). Defendants do not contend that they are in privy with GIA or LaGrippe,[3]

and they are certainly not identical parties. Thus *res judicata* does not bar the present action.

Defendants, cheerfully ignoring the requirement of identity or privity cite *Car Carriers, Inc. v. Ford Motor Company,* 789 F.2d 589 (7th Cir.1986), for the proposition that *res judicata* should apply because both suits arise from a common factual background and "[o]nce a transaction has caused injury all claims arising from that transaction must be brought in one suit or be lost." *Car Carriers,* 789 F.2d at 593. Defendants argue from this that Horsell should have counterclaimed under Rule 13(a) of the Federal Rules of Civil Procedure in the first suit and that Horsell, not they, should bear the loss from its failure to do so. However, Rule 13(a) requires a counterclaim against any "opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim". Horsell was not obligated to counterclaim against GIA and LaGrippe with respect to the issues in the instant case. *American Triticale, Inc. v. Nytco Services, Inc.,* 664 F.2d 1136, 1148 (9th Cir.1981). As plaintiff correctly points out, defendants are actually trying to impose on the doctrine of *res judicata* a requirement that parties file third party complaints or be barred from suing such third parties in the future. Such a position this court is unwilling to take.

On the other hand, the doctrine of collateral estoppel would apply to preclude the issues of defendants' negligence and fraud if these issues had been fully litigated in the first suit. *See American Triticale, Inc.,* 664 F.2d at 1147; *Gammel,* 72 N.W.2d at 369. However, plaintiff claims these issues weren't raised, much less fully litigated, as the case was settled without any findings of fact as to the present defendants' conduct. Defendants do not deny this basic contention and we are,

---

2. To the extent plaintiff's common law claims are here on diversity jurisdiction, state law governs. The question of whether the parties should be appraisers or arbitrators would then be a matter of state law.

3. Nor could the defendants make that claim, as their interests are not congruent with those of GIA and LaGrippe who could not therefore have adequately represented the present defendants' interests. *See Donovan,* 778 F.2d at 301.

therefore, precluded from applying collateral estoppel to the plaintiff's present claims.

### III. The Sufficiency of Plaintiff's Claims

Defendants attack each count in plaintiff's complaint alleging various insufficiencies. A review of these attacks is informed by the established standard that "a complaint should not be dismissed ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Further, we take all facts pleaded in plaintiff's complaint as true.

■ Defendants argue that count I does not state a claim for breach of contract because no contract was formed. However, plaintiff alleges that it, along with its partner GIA, paid defendants $10,000 to perform an appraisal. Clearly, this alleges a contract. Defendants further argue that even if a contract was formed no breach occurred because they were performing in good faith. However, the very issue in question here is whether defendants knowingly breached their contractual duty to perform in good faith by issuing a report containing "numerous material errors" (complaint, ¶ 19). This question of fact is precisely the kind which cannot be determined at the pleading stage.

■ Defendants seek to dismiss plaintiff's negligence claim on two grounds: (1) that defendants' acts did not cause plaintiff's injury, and (2) the injury is purely economic and not recoverable in tort. The causation argument lacks factual merit as plaintiff claims that because of defendants' report it suffered a $1.7 million loss. The "wrong remedy" argument lacks legal merit. Illinois law does preclude recovery for pure economic loss in a tort action against a manufacturer of a product. *Moorman Manufacturing Company v. National Tank Company*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). However, the *Moorman* decision does not cover actions for professional malpractice. *See Rosos*

*Litho Supply Corp. v. Hansen*, 123 Ill. App.3d 290, 297, 78 Ill.Dec. 447, 452, 462 N.E.2d 566, 571 (1st Dist.1984); *Penn v. Metro Data Company*, No. 81 C 3051, slip op. (N.D.Ill. Jan. 21, 1983). Thus, Horsell's claim for negligent misrepresentations states a valid cause of action.

■ Defendants attack count III, which claims willful and wanton breach of duty, on the ground that "mere conclusory allegations of willful and wanton conduct are insufficient as a matter of law" (defendants' mem. at 14). However, the count contains, at paragraph 20, an extensive list of errors that plaintiff alleges defendants knew existed. This is sufficient to meet the pleading requirement of facts "which would show the intentional breach of duty resulted in injury." *Booker v. Chicago Board of Education*, 75 Ill.App.3d 381, 385, 31 Ill.Dec. 250, 253, 394 N.E.2d 452, 455 (1st Dist.1979).

■ Count IV complains of common law fraud in that defendants knowingly misrepresented that they would perform their duties in a competent and professional manner, and in that the defendants issued a report which they knew to be false. Defendants argue that the first component should be dismissed because it is a representation of future intention which cannot be redressed in an action for common law fraud. However, as this court has recognized, "[t]he Illinois rule on future promises has a significant exception. When a promise or representation relating to future conduct is alleged to be the scheme employed to accomplish the fraud, it is actionable." *Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014, 1027 (N.D.Ill.1985). Here, plaintiff has alleged that defendants represented that "they would listen to and take into account all the facts" when preparing a report (complaint, ¶ 35), that defendants knew these representations to be false when made (complaint, ¶ 36), and that if plaintiff had known them to be false when made it would not have retained defendants to perform the appraisal (complaint, ¶ 37). We

find these allegations sufficient to allege a scheme to defraud. *See Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 1112, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (4th Dist.1980). Regarding the issuance of a false report, defendants argue lack of causation because Horsell was contractually bound to accept the report. However, this does not preclude a finding that the report caused Horsell a loss as it was not contractually bound to accept a report as a correct statement of the value of its purchase.

■ Defendants seek to dismiss count V, which alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"). Defendants argue that the Fraud Act requires a public injury and a "pattern" of deceptive activities. Although the reach of the Fraud Act has not been defined as securely as defendants would like us to believe, we agree with the basic proposition that the Fraud Act does not reach the conduct of which plaintiff complains here. Defendants cite *Newman-Green, Inc. v. Alfonso-Larrain R.*, 590 F.Supp. 1083 (N.D.Ill.1984), in which Judge Shadur reviewed a claim of promissory fraud in light of the Fraud Act. Noting that the Fraud Act provides "broader consumer protection than does the common law of fraud, making actionable ... innocent representations," *id.* at 1085, he found that "courts faced with simple breach of contract claims between businessmen have always denied recovery under the Act." *Id.* at 1086. The Fraud Act is intended to reach "practices of the type which affect consumers generally". *Frahm v. Urkovich*, 113 Ill.App.3d 580, 586, 69 Ill.Dec. 572, 576, 447 N.E.2d 1007, 1011 (1st Dist. 1983). The issue here is whether fraud in the performance of an appraisal affects consumers generally so that it causes a "public injury."

Plaintiff argues that a public injury can be presumed because the appraisal affected the sale of securities and such action is presumed to cause public injury. In support, plaintiff cites *Campbell v. Moseley*,

*Hallgarten, Estabrook & Weeden, Inc.*, [1984–1985 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,082 (N.D.Ill.1985). There Judge Holderman held that a violation of § 10(b) of the Securities Exchange Act "can be presumed to have injured the public," and therefore states a cause of action under the Fraud Act. *Id.* at 91,415–91,406. However, we find *Campbell* inapposite for two reasons. First, that case involved a defendant (a broker) making highly speculative trades on an account for a plaintiff (an 81-year old widow), whose stated investment purpose was preservation of capital with some generation of income. The case cannot be characterized as one "between businessmen," whereas the present one is. Further, the issue here is not the sale of securities, but an appraisal report.[4] In that sense this case is more like *Frahm, supra,* which involved a claim against an attorney for fraudulently misrepresenting material facts in a real estate transaction. There the court refused to extend the Fraud Act to "impose statutory liability for misconduct amounting to professional malpractice." *Frahm*, 113 Ill.App.3d at 582, 69 Ill.Dec. at 574, 447 N.E.2d at 1009. We agree with the *Frahm* reasoning and are constrained by it. *See Newman-Green, Inc.*, 590 F.Supp. at 1087. Therefore, we dismiss count V.

■ Count VI is a federal securities law claim under § 10(b) of the Securities Exchange Act and Rule 10b–5. Defendants first argue that these laws do not provide for recovery when the alleged misrepresentation was made after plaintiff decided to purchase its partner's stock. While this statement of the law is overly simplistic, we find the law does not support plaintiff's claims.

Plaintiff cites *Goodman v. Epstein*, 582 F.2d 388 (7th Cir.1978), *cert. denied* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), for the proposition that as long as an investment decision is available to the

4. We dismiss the securities count as well, *see    infra.*

buyer (in this case) at the time of the fraud, it is actionable, even if the buyer was obligated at that time to purchase the security. *Goodman* does stand for this proposition *in the context* of an investment agreement that was "ongoing" in that a "continuing relationship was contemplated." *Id.* at 412.

> Because of this ongoing relationship and the fact that the entire [investment sum] for phase 1 was not collected "up front" but was to be contributed "from time to time" as phase 1 progressed towards completion, the purchasers were left with the possibility of an investment decision each time a call was made.

*Id.* at 412–413. The court expressly distinguished the situation from one where

> the investment decision was completed at the time the parties entered into the agreement, the contract between purchaser and seller being, in effect, a "one-shot deal." No continual relationship was contemplated. All that was left undone was the ministerial exchange of the money for the stock. The seller would have had no legal alternative to performing the contract, even if it had acquired the information in question.

*Id.* at 412.

The present case resembles the latter situation. The agreement between Horsell and its partner allowed Horsell to back out if defendants did not submit a final report by July 31, 1984.[5] Horsell received a draft report from defendants on June 27, 1984. Extremely dissatisfied with the draft, Horsell sent Holmes a ten-page letter on July 13, 1985, "pointing out both the critical factual errors upon which the inflated valuation was based and the errors in methodology" (complaint, ¶ 18). On July 25, 1985, plaintiff and defendants met to further discuss the report and plaintiff claims defendants promised not to issue a final report

until the errors were corrected (complaint, ¶ 20). Horsell is here because it believes defendants failed to keep their promise, but its own behavior indicates it realized it could not get out of its agreement with its partner due to plaintiff's mistakes. Otherwise, why not then make the "investment decisions" it now claims were available, namely, replacing the defendants or suing them for declaratory judgment, relieving it of its obligations under the agreement? In other words, the element of "reliance" necessary in Rule 10b–5 cases is not present where, as here, "the information, even if supplied, would not have entitled the plaintiff to refuse to carry out the transaction." *Goodman,* 582 F.2d at 412.

Plaintiff has an alternative argument based on the "forced seller" exception to the reliance requirement. However, the Seventh Circuit's recent rumination on this doctrine precludes plaintiff's argument:

> Plaintiffs also attempt to rely on the "forced seller" doctrine.... In the substantial number of cases where it has been applied a shareholder has been treated as a seller when the nature of his investment has been fundamentally and involuntarily changed. This circuit has yet to accept or reject the "forced seller" doctrine and we express no view on the continued efficacy or scope of the doctrine. It is enough to state that the plaintiffs have not shown any fundamental change in the nature of their investment. The crux of the claim is the diminution in the value of the plaintiffs' equity interest, and this has been held to be outside of the scope of the "forced seller" concept.

*Ray v. Karris,* 780 F.2d 636, 640 n. 2 (7th Cir.1985). Similarly, at issue here is the value of plaintiff's interest and not the nature of their investment. Therefore, we dismiss count VI from the complaint.

---

**5.** The agreement provided as follows:

(c) In the event that the Appraisal Firm does not notify all the parties hereto of its determination of Purchase Price and the Ter-

mination Amount on or prior to July 31, 1984, any party hereto may terminate the agreement evidenced hereby by notice given to the other parties.

Obviously abreast of the current trends in fraud litigation, plaintiff has included the obligatory RICO counts, 18 U.S.C. § 1961 *et seq.* (counts VII and VIII). Count VII is grounded in 18 U.S.C. § 1962(a); count VIII relies on § 1962(c). Plaintiff has adequately alleged the enterprise and predicate act elements of RICO. For purposes of § 1962(c) Holmes and Raidt are the "persons" and Valuation Counselors, Inc. is the enterprise. No such difference in identity is required to plead a violation of § 1962(a). *See Haroco, Inc. v. American National Bank and Trust Company of Chicago,* 747 F.2d 384, 400–402 (7th Cir.1984), *aff'd* 473 U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).[6]

In *Papai v. Cremosnik, et al.,* 635 F.Supp. 1402 (N.D.Ill.1986), we held that to meet the pattern element a plaintiff must allege multiple episodes of illegal activity which evince a regular ongoing course of conduct, *id.* at 1413, or from which a reasonable inference can be drawn, that "the episodes were not an aberration in the way a defendant conduct[s] his business." *Id.* at 1412. The pleadings here make this inference impossible to draw. However, because *Papai* post-dates the parties' briefing we dismiss counts VII and VIII with leave to amend.

Defendants raise one final point. They argue that Raidt and Holmes should be dropped as individual defendants because they owed no duty to plaintiff separate from that owed by Valuation Counselors, Inc. However, plaintiff claims they were involved in the fraud and mentions them as individuals in the RICO counts. At this point Raidt's and Holmes' roles are not clear enough to dismiss them, so we decline to do so.

### Conclusion

Defendants' motion to dismiss is granted with respect to counts V and VI, and denied with respect to counts I through IV. Counts VII and VIII are dismissed with leave to amend.

---

6. Plaintiff seems to have gotten § 1962(a) and (c) confused because it pleads Holmes' and

Raidt's individual activities under count VII rather than VIII. However, no harm is done.