**LHLC CORPORATION, Plaintiff,**

v.

**CLUETT, PEABODY & CO., INC. and Deloitte Haskins & Sells, Defendants.**

No. 86 C 778.

United States District Court,
N.D. Illinois, E.D.

May 26, 1987.

Paul Shuldiner, Herbert Beigel, Herbert Beigel & Assoc., Ltd., Chicago, Ill., for plaintiff.

Joan Hall, Patricia Lee Refo, Jenner & Block, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiff LHLC Corporation brings this action pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., charging that defendant Deloitte, Haskins & Sells ("DHS") defrauded plaintiff by materially misrepresenting the value of the inventory during the sale of the stock of a company to plaintiff in February, 1983. On October 27, 1986, I dismissed defendant Cluett, Peabody & Co., Inc. ("Cluett") from this action on estoppel grounds. Currently before the court is the motion of defendant DHS to dismiss the complaint for failure to state a claim upon which relief can be granted. The complaint consists of four counts. Count I is the securities fraud count. Counts II, III and IV are pendent state law counts for fraud, negligent misrepresentation, and negligence, respective-

ly. For the reasons stated below, the motion to dismiss is granted.

Although the facts have already been presented in the October 27 opinion, I will briefly review them here, taking the factual allegations of the complaint and plaintiff's exhibits as true. On February 3, 1983, plaintiff entered into a purchase agreement with Cluett to buy the stock of Henry C. Lytton & Company from Cluett. See Am.Compl.Ex. A. The purchase price was set at $14,454,000. reflecting the December 31, 1982 book value of Lytton's stock. *Id.* at 4–6. This base price was subject to adjustments due to fluctuations in Lytton's financial position between the end of 1982 and January 31, 1983. *Id.* 4–5. Although the actual nature of the possible adjustments are not relevant to this litigation, see Am.Compl. § 8, the purchase agreement provided for a detailed procedure on how these fluctuations were to be determined, and how disputes about the fluctuations were to be resolved.

The book value of Lytton set forth in the purchase agreement was based on a December 31, 1982 "Closing Balance Sheet." The figures on that balance sheet could be questioned in a breach of warranties claim brought pursuant to Articles III and IV of the contract. One of Cluett's warranties in Article III pertained to the quality and value of Lytton's inventories. The value of the inventory noted in the December 31, 1982 Closing Balance Sheet was $7,594,000. The inventory warranty was to survive for one year following the closing of purchase.

Prior to the February 4, 1983 closing of the purchase agreement, but on that same day, Cluett provided plaintiff with an inducement letter. The letter stated that not later than 45 days after February 4, Cluett would deliver a "final" balance sheet as of January 31, 1983, prepared in accordance with generally accepted accounting principles. This letter also stated that this final balance sheet would be accompanied by a statement from DHS to the effect that the inventory on the final balance sheet was "fairly" stated. See Ex. 4 to Pl.Br. Finally, the inducement letter also provided that Cluett would include its opinion that the

final balance sheet presents fairly the financial position of Lytton on January 31, 1983, in accordance with generally accepted accounting principles.

Shortly after the February 4, 1983 closing, and as promised, Cluett drew up the balance sheet reflecting the financial position of Lytton as of January 31, 1983. This sheet valued Lytton's inventories on that date at $7,921,000. On March 7, 1983, DHS sent Cluett a letter in which it observed that Cluett's valuation of the Lytton inventory fairly stated the worth of the inventory. Am.Comp.Ex. B. On March 21, 1983, Cluett sent this letter to plaintiff in accordance with the inducement letter. This letter is the only communication from DHS to plaintiff upon which plaintiff predicates its securities claim against DHS. No other communication—particularly no pre-February 4 communication—from DHS to plaintiff is alleged with any particularity in the complaint. The March 7 letter is alleged to falsely state the value of the inventory. Am.Compl. ¶ 10(c). The correct value of the inventory was at least $2,772,000 less than DHS acknowledged in its letter. Moreover, the DHS letter overstated the inventory's value by intentionally or recklessly failing to acknowledge that many inventory items were unusable or unsaleable.

Although plaintiff had executed and closed on the purchase agreement on February 4, 1983, following Cluett's inducement letter of the same day, plaintiff alleges that DHS's March 7 letter was a "material part of the acquisition and the final consumation [sic] of the purchase transaction and Purchase Agreement." Am. Compl. ¶ 11. This appears to be a legal conclusion, the correctness of which the court may examine later. Plaintiff also alleges that DHS knew that the primary reason that it was preparing Lytton's financial statements was to influence LHLC to enter into and consummate the stock transaction with Cluett. See Am.Compl. ¶ 32 (this allegation only pertains to Count IV (negligence)). Similarly, plaintiff allegedly relied on DHS's certification when it entered into the purchase of the Lytton stock. Am.Compl. ¶ 32 (pertaining only to

the negligence count). Again, this allegation of reliance is a legal conclusion which the court is permitted to scrutinize.

## Legal Discussion

■ DHS attacks the legal sufficiency of the complaint, and particularly Count I. Its chief and strongest argument is that DHS's alleged misrepresentation was not "material" to plaintiff's investment decision, and without such materiality, there can be no securities fraud claim. Plaintiff does not dispute that materiality is an essential element to a securities fraud claim, but insists that because of the ongoing, post-February 4 relationship between the parties, DHS's misrepresentation of March 7 was material to its decision to complete the ·purchase transaction. Accordingly, plaintiff concludes, it may maintain this securities action.

This case can be resolved under Seventh Circuit law. In *Goodman v. Epstein*, 582 F.2d 388 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), the Court addressed the problem of whether a purchaser of securities can maintain a securities fraud action based on a fraudulent misstatement made *after* the time the purchaser became obligated to purchase securities. In that case, the plaintiffs were limited partners in a real estate development limited partnership. Under the terms of the partnership agreement, the limited partners were required to provide additional contributions of capital (up to $3 million) upon calls for such contributions by the general partners. *Id.* at 409, 412. One of the issues on appeal was whether those subsequent capital contributions constituted additional purchases of securities within the meaning of section 10(b) and Rule 10b–5, even though the limited partners were obligated to make those contributions from the inception of the partnership agreement. If so, false statements made by the general partners just prior to calling for the additional contributions would be actionable misrepresentations made in connection with a securities transaction. If not, the only actionable statements would be those made at the time of the initial investment agreement.

*See id.* at 409–10 & n. 63. The plaintiffs in *Goodman* were alleging that the general partners had falsely stated prior to each new call that the partnership was still profitable.

The Seventh Circuit held that the additional contributions did constitute separate purchases of securities. *Id.* at 412–14. The Court reasoned that the limited partners faced a separate "investment decision" each time a call was made. "The purchasers, aware of their ability to bring about dissolution of the partnership if it could not be operated profitably, Ill.Rev. Stat. ch. 106–½ § 32(1)(e)," *id.* at 412, had to decide each time a call was made whether to make an additional investment in the partnership. Thus, had the general partners truthfully disclosed the facts of the successively worsening prospects of the partnership prior to the calls, the limited partners could have made an investment decision not to continue with the partnership by dissolving it. It did not matter that the plaintiffs had obligated themselves to purchase these securities prior to the time of the misrepresentations. Under Illinois statutory law, the limited partners could extinguish those obligations if subsequent facts showed that the partnership was unprofitable. Because the plaintiffs had this statutory right, the plaintiffs were deemed to have made separate investment decisions each time they decided to make those additional contributions. Thus, the general partners' failure to disclose evidence of unprofitability was a *material* misrepresentation which influenced the purchase of additional securities. As such, the misrepresentation was actionable.

In reaching this result, the Seventh Circuit was careful to distinguish the situation where the investment decision is fully completed prior to the misrepresentation. Specifically, the Court identified the situation where an investor enters into an agreement to purchase stock and, after the time of the execution of the agreement but before the mere "ministerial exchange of the money for the stock," see *id.*, a misrepresentation about the value of the stock is made. In such a situation, where the purchaser would have "no legal alternative to per-

forming the contract," even if he had been presented with the truthful information at the time the misrepresentation was made, then "the information was not material and could not have been relied upon in making the investment decision." *Id.* Because the investor irrevocably obligated himself to the stock purchase *prior* to the misrepresentation, the misrepresentation could not have been material to the transaction as a matter of law.

This was the situation Judge Moran faced in *Horsell Graphic Industries, Ltd. v. Valuation Counselors, Inc.*, 639 F.Supp. 1117, 1123 (N.D.Ill.1986). In *Horsell*, the plaintiff (Horsell) contracted to purchase its partner's stock in a company which distributed Horsell's products. Under the contract, the purchase price for the stock was to be determined by an independent appraiser. The appraisal was to take place after the parties entered into their purchase agreement. However, once the appraiser issued its valuation report, the plaintiff alleged the report overstated the value of the stock by more than $2 million and refused to pay  The partner sued Horsell on the purchase contract and Horsell, bound by the contract, settled the lawsuit agreeing to a slightly lower purchase price.

Having suffered what it considered to be a sizeable loss, Horsell then sued the appraisal firm under section 10(b) and Rule 10b–5. Judge Moran dismissed the securities fraud claim, finding that this case was identical to the situation distinguished in *Goodman.* He emphasized that Horsell had committed itself to the transaction before the appraisal report was issued. 639 F.Supp. at 1123. Under the purchase agreement, only one situation could extinguish Horsell's purchase obligations: if the appraisal firm did not issue its report by July 31, 1984, plaintiff could back out of the contract. The appraisal firm submitted its report before this date, as expected, but the plaintiff was extremely dissatisfied with what it later alleged to be fraudulent misstatements. Notwithstanding these misstatements, the securities fraud claim was dismissed. Judge Moran reasoned that even if the plaintiff had been told the truth in the appraisal report (i.e., that the

company was in fact worth $2 million less than actually reported), the plaintiff did not have the option of declining to purchase the company, given that the report was issued on time. The appraiser's misrepresentations, therefore, were not "material" to plaintiff's investment decision to purchase the company. *Accord Pittsburgh Coke & Chemical Co. v. Bollo*, 421 F.Supp. 908 (E.D.N.Y.1976), *aff'd on other grounds*, 560 F.2d 1089 (2d Cir.1977):

> For purposes of a Rule 10b–5 claim, events occurring after the commitment to purchase stock are irrelevant. Issues of non-disclosure, misrepresentation, materiality, and reliance are to be determined by the situation and knowledge of the parties at the time they committed themselves, and not on the basis of subsequent events, even though they occurred prior to "the formal closing date when the delivery and payment are formally completed and cleared."

*Id.* at 923 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890 (2d Cir.1972).

This case falls within the principle of *Horsell, Pittsburgh Coke*, and the situation distinguished by the Seventh Circuit in *Goodman.* Plaintiff was irrevocably bound to purchase the Lytton stock from Cluett when it executed the purchase agreement on February 4, 1983. Plaintiff was satisifed with Cluett's inducement letter of February 4, in which Cluett promised to deliver within 45 days a balance sheet of Lytton's assets as of January 31, 1983. Plaintiff was also satisfied with the inducement letter's promise that the new balance sheet would be accompanied by DHS's acknowledgment that the inventory was "fairly" stated. All of these pre-February 4 statements were made only by Cluett. For reasons not presented to the court, plaintiff did not insist that DHS accredit Cluett's representations about the inventory *prior* to plaintiff's execution of the February 4 purchase agreement. Plaintiff was willing to execute that agreement merely on Cluett's promise that DHS's certification would be forthcoming. Once that agreement was executed, nothing in the

future might extinguish plaintiff's purchase obligations. Thus, the March 7 DHS letter plaintiff eventually received could not, as a matter of law, have materially influenced plaintiff's investment decisions with respect to the purchase agreement because plaintiff had already bound itself to perform on that agreement. Unlike the plaintiff in *Goodman,* plaintiff here would have had no legal right to avoid performing its obligations under the purchase agreement even if plaintiff had been correctly apprised of the true inventory value on March 7. Accordingly, plaintiff was not in a position after February 4 to make an investment decision about performing its purchase obligations.

Plaintiff suggests that this case involves an ongoing relationship between it and Cluett so that the case is governed by the result of *Goodman.* It is true that there was an ongoing relationship between the parties with respect to adjustments of the final purchase price after February 4. But as plaintiff itself alleges in the complaint, the bases for these adjustments are "not relevant" to this case. Am.Compl. ¶ 8. These adjustments pertain to inter-company transfers, deferred tax credits, and operating losses during the month of January, 1983. Am.Compl.Ex. A at 4–5. The "ongoing" relationship language in *Goodman* pertains only to a relationship regarding investment decisions. But here, there was no opportunity, either in the contract or by law, for plaintiff to make further investment decisions with respect to the purchase of the Lytton stock once plaintiff had bound itself to purchase the stock in the February 4 agreement, and given that DHS did not misrepresent any facts *prior* to that agreement. The absence of any post-February 4 investment decisions for plaintiff to make takes this case outside the result of *Goodman* and places it squarely within *Horsell.*

Of course, this result could have been different as to Cluett since Cluett may have made pre-February 4 misrepresentations to plaintiff (such as its statement in the inducement letter that DHS would fairly state the inventory value and its own statement about the inventory). But the sufficiency of such a claim was addressed in the October 27 opinion where I found the securities fraud claim against Cluett fatally flawed on account of the estoppel defense. Moreover, nothing in this opinion intimates a view on the sufficiency of a breach of warranty claim (pursuant to Article III of the purchase agreement) against Cluett based on its alleged misstatement of the inventory value in the December 31, 1982 Closing Balance Sheet, a pre-February 4 misrepresentation.

But as to DHS, this claim must be dismissed. Simply put, Cluett promised to sell plaintiff a company with a stated inventory value. Cluett promised that *after* plaintiff agreed to buy the company, Cluett would supply plaintiff with an accountant's (DHS's) acknowledgment that Cluett had fairly stated the inventory value. Rather than insisting on the acknowledgment prior to execution, plaintiff executed the contract. DHS's subsequent representations could not have materially influenced plaintiff's decision to enter into the purchase agreement since those representations were not made until after plaintiff entered the agreement. Plaintiff did not need to hear DHS's representations to execute the agreement. In such circumstances, materiality is absent and the securities fraud claims must be dismissed.

**Conclusion**

Defendant DHS's motion to dismiss Count I for failure to state a claim is granted. The remaining state counts are dismissed for lack of subject matter jurisdiction. This case is dismissed.

It is so ordered.