LHLC CORPORATION,
Plaintiff–Appellant,

v.

CLUETT, PEABODY & COMPANY, INC., and Deloitte, Haskins & Sells, Defendants–Appellees.

Nos. 86–3055, 87–2002.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1988.

Decided March 3, 1988.

Rehearing and Rehearing En Banc Denied April 11, 1988.

---

Bruce Rose, Beigel & Sandler, Chicago, Ill., for plaintiff-appellant.

Wilbur H. Boies, McDermott, Will & Emery, Joan M. Hall, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

For many years Henry C. Lytton & Co., which operated a number of department stores, was a subsidiary of Cluett, Peabody & Co. In 1983 Cluett sold its stock in

Lytton for $14.5 million to LHLC Corp., a closely-held firm that financed the acquisition almost entirely by debt, which it hoped to repay out of income from Lytton's future operations. Almost $8 million of the purchase price represented the estimated value of Lytton's inventory. Less than a year after acquiring Lytton's, LHLC Corp. filed for bankruptcy. Among its creditors, to the tune of about $180,000, was Cluett, which sold goods to LHLC on open account.

LHLC believes that Cluett misrepresented the value of Lytton's inventory, inducing LHLC to pay a price higher than the facts warranted. It filed this suit under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, with pendent claims under state law. The suit may proceed even though Cluett sold LHLC the entire business. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). According to the complaint, after Cluett had failed to sell goods on which markdowns had been taken, it placed the merchandise back in inventory and told LHLC that it was salable at retail price. Cluett did not allow LHLC to inspect the inventory before the sale (for fear that this would disrupt operations and impair the morale of the staff); the contract of sale contains not only Cluett's warranty of the value of the inventory but also a statement that LHLC "strictly relied" on Cluett's representations.

LHLC named Deloitte, Haskins & Sells, Cluett's accountant, as a second defendant. The contract between Cluett and LHLC required Cluett to furnish LHLC with a report of the value of the inventory. The report, which Deloitte approved, showed that the inventory was properly valued at some $7.9 million in accordance with generally accepted accounting principles. LHLC believes that this, too, was false and fraudulent; it characterizes Deloitte as Cluett's aider and abetter.

The district court granted summary judgment to Cluett on the ground that LHLC is estopped to pursue any remedy against it, dismissed the securities claim against Deloitte for failure to state a claim on which relief may be granted, 665 F.Supp. 637 (N.D.Ill.1987), and dismissed the pendent state claims against Deloitte for lack of subject-matter jurisdiction. We start with the claim against Deloitte.

I

A deal of this kind depends on an accurate valuation of the assets of the firm being sold. That value changes from day to day. The parties recognized this and assessed the worth of the assets on at least three occasions. One was at the end of December 1982, when Cluett furnished LHLC a tentative valuation of the inventory, cash, receivables, and other fluctuating items. The second was on February 4, 1983, the date of closing, when Cluett informed LHLC of its estimate of the value of the inventory (and the other fluctuating items) as of January 31, 1983, the date the parties had chosen for fixing the price. LHLC paid the price implied by Cluett's estimates. The third was in March 1983, when Cluett drew up a final statement of the actual January 31 values that had been estimated on February 4. The contract required the parties to make adjustments in the price for any differences between the preliminary estimate of February 4 and the final estimate of March.

The value of the inventory was estimated on each occasion; unlike cash on hand, it could not be measured with precision. On February 4 Cluett furnished LHLC with an "inducement letter" stating that it would provide a final valuation of the inventory in accordance with generally accepted accounting principles, and that its accountant would so certify. Cluett drew up a balance sheet, assessing the worth of the inventory at $7.9 million as of January 31, 1983. Deloitte sent Cluett a letter, dated March 7, 1983, stating that this balance sheet fairly represented the value of the inventory in accordance with generally accepted accounting principles. Cluett relayed this letter to LHLC. This is the only writing signed by Deloitte that reached LHLC. LHLC says that Cluett's estimate is $2.7

million high, and that Deloitte's letter, like Cluett's balance sheet, is fraudulent.

LHLC's difficulty is that the communication from Deloitte arrived after the closing. It was too late for LHLC to back out of the sale. LHLC made its investment on February 4, 1983. Only the potential for litigation remained. The most it could have done—if, say, Deloitte's letter had said that Cluett's figure was too high and that the proper figure was $5.2 million—would have been to make a claim against Cluett under the warranty.

■ The district judge concluded that any misstatements in Deloitte's letter were not "material" because they did not affect LHLC's decision to close the transaction on February 4. 665 F.Supp. at 639–41. One could say equivalently, and perhaps more accurately, that nothing Deloitte did or could have done caused LHLC to make an investment decision. Materiality has an element of causation built in, because a statement is material only if it so alters the "total mix" of information available to the investor that it has the potential to affect the decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). But materiality usually refers to the importance of the information; a datum that would have only a small effect on the price is not material, while a datum with the potential for a larger effect is. The valuation of the inventory ($7.9 million versus $5.2 million) would be material in this usual sense, except for the fact that Deloitte did not communicate with LHLC until after the closing. By then it was too late. The information, even if conventionally "material", did not affect the investment decision.

■ Ever since *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir.1974), courts have been distinguishing between "transaction causation" and "loss causation". See Thomas Lee Hazen, *The Law of Securities Regulation* § 11.5 (1985) (collecting cases). *Currie v. Cayman Resources Corp.*, 835 F.2d 780, 785–86 (11th Cir.1988), is a recent example. The plaintiff must show both. "Loss causation" means that the investor would not have

suffered a loss if the facts were what he believed them to be; "transaction causation" means that the investor would not have engaged in the transaction had the other party made truthful statements at the time required. These terms, ungainly to start with because they conscript nouns for service as adjectives, have been confusing in practice because they do not link the definition of "causation" to any theory about why people might be liable under the securities laws. The "transaction" in question is undefined. It is almost always possible to show that a given disclosure or nondisclosure could have affected *some* transaction, at some level of probability. Used without care, these terms hinder rather than facilitate understanding. See Hazen at 321; Richard Jennings & Harold Marsh, *Securities Regulation: Cases and Materials* 1047 (5th ed. 1982). What should happen when the missing information affected a decision not to file a lawsuit about the securities, as in *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir.1977)?

We have suggested in recent years that the appropriate inquiry is whether the information disclosed or withheld affected an *investment* decision. E.g., *Harris Trust & Savings Bank v. Ellis*, 810 F.2d 700, 704 (7th Cir.1987) (collecting cases). See also, e.g., *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 847–48 (2d Cir.1986). The securities laws single out investment decisions concerning financial instruments from among the many decisions people must make. Whether to buy a house or go to school or take a job or file a suit may be important, but the securities laws do not apply to these decisions. The securities laws deal with instruments that have at least the potential to be traded in liquid markets, see *Marine Bank v. Weaver*, 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed. 2d 409 (1982). Information about these instruments should be compiled and released by a single source, usually the issuer, to facilitate both trading among passive investors and the ability to compare the prospects of one firm against the prospects of others—a comparison essential if capital is to flow to its most valuable uses.

If a person is locked into possession of a security, however, disclosure serves neither of these functions. Capital has been committed, and trading will not occur. Decisions concerning the securities then are not fundamentally different from decisions concerning works of art. The buyer of a purported Rembrandt who learns that the painting was only by "the studio of" the artist faces a tough decision, but not an investment decision.

■ In March 1983 and the following months—after LHLC inspected the inventory and concluded that it was not worth $7.9 million, and Cluett rebuffed its claim for an adjustment of the price—LHLC had to decide whether to file suit under the securities laws or Cluett's warranty. That litigating decision is the same sort of choice facing the buyer of art or the tenant having trouble with the landlord. We have held repeatedly in recent years that the securities laws do not ensure that people will receive information sufficient to make correct decisions about filing or pursuing lawsuits. E.g., *Harris Trust*, 810 F.2d at 704; *Ray v. Karris*, 780 F.2d 636, 641–43 (7th Cir.1985); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 833–34 (7th Cir. 1985); *O'Brien v. Continental Illinois National Bank*, 593 F.2d 54, 60–61 (7th Cir. 1979); *Goodman v. Epstein*, 582 F.2d 388, 409–14 (7th Cir.1978) (distinguishing between a misrepresentation after a one-shot deal, which is not actionable even though it could be pertinent to litigation, and a fraud after the closing that is pertinent to future investment decisions such as the contribution of additional capital, which is). Any implication to the contrary in *Wright v. Heizer Corp.*, 560 F.2d 236, 250 (7th Cir. 1977), must be read in light of these later cases. Deloitte's letter came too late to affect the closing; by the time LHLC received the letter, it had inspected the inventory itself and decided that $7.9 million was too high; any falsity in Deloitte's letter did no more than deprive LHLC of a bargaining chip in negotiations with Cluett or of evidence in a subsequent suit. This is not a *securities* problem.

LHLC tries to avoid the force of this by contending that Deloitte aided and abetted Cluett's violations, which preceded the closing. We have held that victims may collect from aiders and abetters under § 10(b) and Rule 10b–5 even though they do not satisfy the requirements of controlling or controlled party liability under § 20 of the '34 Act, 15 U.S.C. § 78t. *Brennan v. Midwestern United Life Insurance Co.*, 259 F.Supp. 673 (N.D.Ind.1966), affirmed, 417 F.2d 147 (7th Cir.1969). That conclusion has not received universal approbation, see Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L.Rev. 80 (1981), and the Supreme Court has reserved the question for future decision. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983). We need not revisit the subject, because the aiding-and-abetting claim fails under *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir.1986). *Barker* concludes that a party other than the purchaser or seller of the securities faces liability as an aider and abetter only if it committed one of the fraudulent or manipulative acts with the requisite intent—that is, only if it would have been primarily liable had it purchased or sold the securities. See also *First Interstate Bank of Nevada, N.A. v. Chapman & Cutler*, 837 F.2d 775, 778–80 (7th Cir.1988).

■ When the problem consists in keeping silence while the primary violator carries out the fraud, the plaintiff must show that the silent person had a legal duty to speak. *Barker*, 797 F.2d at 496–97. *Barker* held that a law firm and an accounting firm were not obliged to speak up concerning any knowledge they may have had about an ongoing fraud, and as a result their silence—even if morally culpable—did not have legal consequences under the securities laws. *First Interstate Bank* came to a similar conclusion about a law firm that did not publicize its doubts about the enforceability of some municipal bonds. LHLC's claim fails for the same reason. Even if Deloitte consulted with Cluett and reviewed the initial $7.9 million estimate before the closing, even if Cluett's estimate

is fraudulent, Deloitte had no obligation to blow the whistle. Such an obligation could be imposed by state or federal law; perhaps one should be imposed; but none has been imposed. Deloitte therefore was answerable only for what it communicated to LHLC, and it did not communicate with LHLC until after the closing.

The complaint does not charge Deloitte with any other wrongdoing. Although LHLC now invites speculation that Deloitte had assured Cluett in advance that it would verify any estimate, and thus made Cluett bold enough to lie, speculation does not satisfy the requirement of Fed.R.Civ.P. 9(b). The complaint does not contain an allegation, "with particularity" or otherwise, about Deloitte's activities before the closing. The district court properly dismissed the complaint against Deloitte.

## II

The contract called for Cluett to ascertain by early April 1983 the values of fluctuating items as of January 31, 1983, and to send LHLC a "Purchase Price Schedule". This schedule was conclusive, with the proviso that LHLC could obtain a binding resolution by an independent accounting firm. Cluett submitted the "Purchase Price Schedule" on April 5, 1983, showing that Cluett owed LHLC $20,000. On May 4 LHLC sent Cluett a letter complaining about several items on the Purchase Price Schedule, including inventory—which LHLC said was overvalued by $2,772,000. At a meeting on May 10 Touche Ross & Co., LHLC's accountant, expressed the opinion that the valuation of $7.9 million could not have been produced by the application of generally accepted accounting standards. Cluett replied by letter of May 19 that the inventory dispute did not concern the Purchase Price Schedule, because the contract forbade any changes in the closing balance sheet submitted on February 4. Cluett treated the protest as a claim under the warranty, which it rejected on the ground that the parties had discussed and agreed before the closing on the treatment of markdowns concerning the inventory. This letter enclosed a check for $20,-000. Apparently accepting Cluett's view that the inventory matter was not a dispute about the Purchase Price Schedule, LHLC did not request resolution by an independent accounting firm. It filed this suit in 1986, almost two years after entering bankruptcy.

■ Cluett asserted that the suit is barred by laches, waiver and estoppel: laches because its defense has been injured by the delay, waiver because LHLC intentionally surrendered its right to sue by conducting business as usual with Cluett after the dispute arose. The district court did not resolve these claims, and we do not do so either. The defense of laches calls for evaluation of prejudice on which the district court should have the leading role. Waiver is a contractual defense. LHLC could surrender its claim for a peppercorn. But it did not sign a writing surrendering the claim, and there is a dispute about whether such an agreement should be implied. Our most recent brush with Illinois' rules governing waiver of the right to sue, by continuing to do business, led us to conclude that such claims turn on questions of intent and duress. *Havoco of America, Inc. v. Hilco, Inc.*, 731 F.2d 1282 (7th Cir. 1984), after remand, 799 F.2d 349 (7th Cir. 1986) (twice reversing grants of summary judgment for the defendants). We said "that an essential element of waiver is that the injured party intended to affirm the contract and intended to abandon his right to recover damages." 799 F.2d at 354. See also *Bledsoe v. Carpenter*, 163 Ill.App. 3d 823, 516 N.E.2d 1013 (3d Dist.1987). The record contains information looking in both directions on questions of LHLC's intent in 1983, making an award of summary judgment on this issue inappropriate.

■ The district court nonetheless granted summary judgment to Cluett, holding that no matter what message LHLC *intended* to convey, Cluett *understood* LHLC to have abandoned its claim, and relied on that understanding by extending credit. Under Illinois law a person may be estopped if the adverse party relied to its detriment on misleading acts or representations and had no way to learn the truth.

*Pantle v. Industrial Commission,* 61 Ill.2d 365, 335 N.E.2d 491, 495 (1975); *Pavlakos v. Illinois Department of Labor,* 128 Ill. App.3d 783, 84 Ill.Dec. 18, 471 N.E.2d 547, 553 (1st Dist.1984), affirmed, 111 Ill.2d 257, 95 Ill.Dec. 461, 489 N.E.2d 1325 (1985). The district court found these elements.

The foundation for Cluett's invocation of estoppel is an affidavit from its Chairman, Henry Henley, stating: "Had Cluett known that LHLC intended to pursue a claim for the alleged inventory overvaluation, Cluett would not have extended credit to LHLC's subsidiary, Lytton's." Henley also stated that LHLC conveyed the impression in the spring of 1983 that it would not pursue the claim. Henley maintained that Matt Kallman, one of LHLC's two stockholders, made such a representation in late May 1983, but Kallman filed an affidavit denying that such a conversation had occurred, so this cannot be the basis of a grant of summary judgment. Moreover, on May 31, 1983, one of LHLC's attorneys wrote Cluett a letter stating that LHLC had "requested that I advise you that it cannot agree with your conclusions with regard to its claims for breaches of warranties. LHLC Corporation will continue to pursue its rights with regard to the matter."

On June 15, 1983, Henley spoke by phone with Tom Rafferty, LHLC's other shareholder. Henley insists that Rafferty said point blank that LHLC would give up its warranty claim; Rafferty's affidavit says:

> I told Henry Henley that our attorney strongly recommended that we file suit for the inventory valuation misstatement. In fact, I believe Cluett received a letter from our legal counsel indicating this position. When Henry Henley called concerning this letter, I told Henry Henley that we bought the business to operate it successfully, and we had neither the money, the time nor the desire to enter suit against Cluett. At no time did I say or imply that we were foreclosing the possibility of legal action in the future.

Rafferty's position, in other words, was that he told Henley that LHLC would not sue now, but said nothing about suing la-

ter. Rafferty portrayed LHLC as a cash-starved venture, whose managers were struggling to keep the business going and who in June 1983 had neither time to devote to securities litigation nor the money to finance it. Those circumstances might change. The district court accepted Rafferty's version of the conversation, as it had to for purposes of summary judgment.

Henley contended, and the district court found, that Cluett reasonably inferred that LHLC would not sue then or ever, even if this is not what Rafferty meant. Cluett then extended trade credit to LHLC, which it would not have done if it had known it would be facing LHLC in court. The extension of credit was reliance, detrimental in retrospect because LHLC filed for bankruptcy while owing Cluett $180,000. (The record does not reveal how much of this Cluett is likely to receive in the bankruptcy.)

The lynchpin of this sequence is Henley's statement that Cluett would not have extended credit to LHLC if the two firms were soon to meet in court. The district court characterized this as uncontradicted, and therefore as sufficient support for summary judgment. Yet it is a statement of Henley's intent to do something, not a statement about a fact that can be contradicted by hard evidence. Since Henley did not think that LHLC would sue, the statement was never put to the test. It is not now falsifiable, even if it is false. It may be that "[t]he state of a man's mind is as much a fact as the state of his digestion", *Edgington v. Fitzmaurice,* (1884) 29 L.R. 459, 483 (Ch.Div.) (Bowen, L.J.), but it is not the kind of fact that is readily met by other affidavits.

Cluett had the burden of establishing detrimental reliance. If Henley's self-serving statement about his intent is untrue, Cluett has not carried that burden. A finder of fact would be free to disbelieve Henley's description of his intent, even if there were no contrary evidence. The mere possibility that a jury would find Henley an incredible witness is not sufficient to send this case to a trial, however, if there is no reason to expect such a disposition. Courts

do not hold civil trials on the off-chance of irrational behavior by juries. We think, however, that LHLC would have a fair argument in this case; it could appeal to reason rather than to whim if it urged a trier of fact to disagree with Henley's description of his plans.

Henley was describing a business practice: Cluett would not extend trade credit to its adversaries in litigation. Cluett is a large supplier of dry goods. LHLC cannot be the first of Cluett's customers to threaten suit. Did Cluett cut off open account credit to other adversaries? We do not know, and the absence of such information could lead a jury to doubt Henley's words. If other adversaries got credit, why not LHLC? More to the point, Cluett extended credit to LHLC while the firm was unambiguously threatening suit. During May 1983 LHLC told Cluett in no uncertain terms that it thought it was took. Between May 4 and June 15, Cluett had to assume (even on Henley's view of things) that it was likely to be the defendant in a suit. During that period, Cluett sold goods to LHLC on open account credit as if nothing were amiss. Cluett apparently treated Lytton's as an ordinary customer, assessing the credit risks it was taking and acting accordingly. As Cluett acted in this fashion before June 15, a jury could conclude that it would have continued doing so.

Cluett treats the sale of goods on credit as a favor to LHLC. Doubtless firms do not do favors for their adversaries. A jury might question this approach to trade credit, however. Cluett is a merchant. Following the divestiture on February 4, 1983, Lytton's was a major customer. If Cluett refused to deal on the terms ordinary in the trade, Lytton's might turn to other suppliers, leaving Cluett with unused capacity and unsold inventory. Cluett was selling goods on credit to LHLC—which it knew to be thinly capitalized—because it thought the transactions profitable. A suit by LHLC would not make them less so. If the sales on open account credit were profitable to Cluett, as we must suppose Cluett believed, then Cluett would injure itself by breaking off dealing. A firm might do this for strategic reasons; termination injures both sides, and Cluett might have believed that cutting off credit would have injured LHLC more than it injured Cluett, bringing LHLC to its knees. Even this is open to doubt, however. Cluett's credit to Lytton's hovered around $200,000; LHLC's claim was in the neighborhood of $2.7 million. A threat to withdraw a line of credit less than 10% of the adverse claim does not induce all reasonable businesses to capitulate. Trade credit is common in large measure because sellers can take security interests in the inventory; the seller's risk is substantially less than the amount of the credit. Even a thinly capitalized firm like LHLC therefore had other options—or so a trier of fact might conclude—making Cluett's threat to pull the plug an empty gesture, the equivalent of threatening to shoot itself in the foot. If Cluett would have had sound business reasons to continue to deal with LHLC despite an ongoing dispute about the value of the inventory, then a jury rationally could disbelieve Henley's assertion. And if it did, the basis of the finding of detrimental reliance would vanish.

The district court thought that Henley's affidavit accurately conveyed the state of things: Cluett heard LHLC to say that it would not sue, and but for that impression would not have extended trade credit. That may be exactly right, and as a result may extinguish LHLC's claim. (LHLC apparently concedes that reasonable, detrimental reliance obliterates the claim rather than serving as an offset; we need not decide whether this is correct.) But a rational trier of fact could take a different view about Henley's statement. Since Cluett bears the risk of non-persuasion on the estoppel question, a fair doubt about Henley's assertion precludes the award of summary judgment even though LHLC has not presented evidence of its own that Cluett *would* have extended credit had LHLC filed suit in June 1983. When proof fails, the party with the risk of non-persuasion loses. *United States v. Sblendorio*, 830 F.2d 1382, 1396 (7th Cir.1987). Contrast *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202

(1986) (the party bearing the burden will have to present evidence to resist the motion and may not rest on the possibility that the jury will disbelieve the moving party's evidence); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553–55, 91 L.Ed.2d 265 (1986).

There are disputed issues of material fact concerning estoppel, waiver, and laches. Perhaps the assembly of a more complete record will permit these to be resolved on a further motion for summary judgment. So long as we draw all reasonable inferences in LHLC's favor—as we must—the existing record does not permit a disposition in Cluett's favor.

The judgment is affirmed to the extent it dismisses the complaint against Deloitte. It is reversed to the extent it grants summary judgment in favor of Cluett. The case is remanded for further proceedings consistent with this opinion.