**STATE of Missouri ex rel. Charles E. KRUSE, Director, Missouri Department of Agriculture, Plaintiff–Respondent,**

v.

**SLT WAREHOUSE COMPANY, a Missouri corporation, and Federal Insurance Company, a New Jersey corporation, Defendants–Appellants,**

and

**Howe Grain, Inc., et al., Defendants.**

No. 15561.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 6, 1988.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Oct. 3, 1988.

Application to Transfer Denied
Nov. 15, 1988.

Amy Rehm Hinderer, Lashly, Baer & Hamel, St. Louis, for defendants-appellants.

William L. Webster, Atty. Gen., Edwin H. Steinmann, Jr., Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

CROW, Presiding Judge.

SLT Warehouse Company ("SLT") and Federal Insurance Company ("Federal") appeal from a $161,000 judgment against them on a "Public Grain Warehouseman's Bond" in an action brought by the State of Missouri at the relation of the Director of the Missouri Department of Agriculture. The difficult questions confronting us require a synopsis of the facts whence the litigation arose.

SLT, at all times pertinent herein, was engaged in business as a field warehouseman. The business is described in *American Triticale, Inc. v. Nytco Services, Inc.*, 664 F.2d 1136, 1139 n. 3 (9th Cir.1981):

"Field warehousing is a commercial contractual arrangement among borrower, warehousemen and lendor [sic]. The purpose of the arrangement is to secure a percentage of the borrower's inventory as collateral for a specified working capital line of credit from the lender. The borrower leases a part of his premises to a bonded warehouseman for nominal rent. In turn, the warehouseman stores the borrower's inventory upon the borrower's premises, takes out loss insurance on the stored goods, supplies its presence and inventory controls and issues warehouse receipts to the lender as collateral upon the borrower's loan. The borrower's employees usually perform the physical labor necessary to store the goods, although the warehouseman and borrower agree that these workers are technically the employees of the warehouseman. Upon retirement of the debt the borrower is able to redeem the outstanding warehouse receipts. In short, a field warehouse arrangement is created not to aid the borrower in storing its inventory ... but to secure and protect a creditor in its extension of credit to the borrower."

In the early 1970's SLT entered into a field warehousing arrangement with Howe Grain, Inc. ("Howe Grain"), a company engaged in the business of buying and selling grain. Howe Grain, in the course of its business, borrowed money from Cotton Exchange Bank, Kennett, Missouri ("the Bank"), pledging grain as security for the loans. SLT, as field warehouseman, served as custodian of the pledged grain, issuing warehouse receipts in favor of the Bank and verifying that the volume of grain in SLT's custody was equal to the amount shown on the warehouse receipts. SLT charged Howe Grain a fee for those services.

In 1977 Howe Grain was operating grain elevators at Denton and Rives in southeast Missouri. The Missouri Department of Agriculture ("the Department") determined that a public grain warehouseman's license was required for such operation by the "Missouri Grain Warehouse Law," §§ 411.-010–.701, RSMo 1969, as amended.

On May 25, 1977, Henry A. Howe, "Owner–Manager" of Howe Grain, wrote the Department:

"I am writing in answer to your letter ... that we require a Missouri Public Grain Warehouse License for our elevators at Denton and Rives.

We do not believe that we are required to have one. We do not store grain other than our own.... I'm enclosing a copy of our tickets; and, as you can see, every ticket is either marked for spot price, contract price, or deferred settlement; and, also ... are marked with 'title passes'.

...."

To grasp the import of the letter, one must note the definition of "public warehouse" in § 411.026, RSMo 1969, the version in effect on the date of the letter:[1]

---

1. Section 411.026, RSMo 1969, was repealed effective September 28, 1977, by Laws 1977, S.B.

"(10) 'Public warehouse', all buildings, elevators or warehouses in this state used for the purpose of storing grain of different owners, for a compensation received directly or indirectly except that the provisions of this chapter shall not apply to grain grown and stored on the farm where grown by the owner or lessee of the farm[.]"

As to the tickets mentioned in the letter, we learn from the testimony of an auditor employed by the Department in its Division of Grain Inspection, Weighing and Warehousing that a producer delivering grain to Howe Grain would receive a "scale ticket," described by the auditor as a "nonnegotiable receipt that shows proof of delivery of grain by a depositor to an elevator." The weight of the grain would be stamped on the ticket, along with the "grading factors," such as moisture, foreign material content, dockage, and anything "that affects the quality of the grain."

As explained in the letter, the tickets used by Howe Grain provided for three types of purchase: spot price, contract price and deferred settlement. Spot price, according to the auditor, was "the cash bid of that particular day." Contract price, said the auditor, meant the price established by contract between the elevator and the producer entered into at an earlier time, such contract also providing for the amount of grain to be delivered and the delivery date. Deferred settlement characterized a transaction where title to the grain passed to the elevator at time of delivery but the producer waited to set the price and receive payment until some future time pursuant to agreement with the elevator.

It was stipulated that when SLT first began field warehousing services for Howe Grain, SLT required that the scale tickets used by Howe Grain not provide for grain storage. Accordingly, there was no place on the tickets to indicate that the producer

was storing the grain instead of selling it. The tickets stated: "title passes to Howe Grain Co." SLT's name appeared nowhere on the tickets.

Henry Howe's entreaties to the Department were evidently persuasive, as the Department subsequently requested that SLT, instead of Howe Grain, become a licensed warehouseman. It was stipulated that SLT took the position it should not be required to obtain a public warehouseman's license because of its belief that its issuance of warehouse receipts to only the Bank established that SLT was engaged in a private financing transaction, and it did not receive or store grain from the public. The Department's position was that inasmuch as SLT exercised control of the storage facilities it should be the warehouse licensee.

It was further stipulated that if called to testify, an official of the Department would state that the Department offered to institute a "friendly lawsuit" against SLT to seek a determination of the applicability of the grain warehouseman statutes to SLT. It was also stipulated that if called to testify, an official of SLT would state he did not recall any mention of a friendly suit and he does not regard any lawsuit as friendly.

In a letter to the Department dated November 20, 1978, regarding sundry forms required by the Department in connection with an application for a public warehouseman's license, a vice president of SLT said:

"With regard to the form for 'Schedule of Charges for storage and handling grain' I am going to ignore this form because our contract does not cover charges for anyone other than to the Howe Grain Company and since there is no farmers storage here I feel this would not be applicable."

By letter of April 9, 1979, SLT's senior vice president submitted to the Department an application by SLT for a license to operate a public grain warehouse per "Chapter

75, pp. 610–27, and replaced by a new section, similarly numbered. New § 411.026 provided, among other things:

"(20) 'Public warehouse', a warehouse used for the purpose of storing grain of different owners for a compensation received directly

or indirectly, whether grain of different owners be commingled or whether identity of different lots be preserved, or a warehouse used for any purpose for which a license is required under section 411.255[.]"

411, RSMo." The letter stated, among other things:

"As I know that you well recall ... we are only involved in a private financing transaction but only issue Field Warehouse Receipts to a lending institution.

....

I have not included the Schedule of Charges since we do not store for the Public and that is contained in our contract with our Customer...."

One section of the application form called for an itemization of "services" offered by the applicant. SLT showed "None." A form submitted in conjunction with the application required the applicant to set forth its schedule of charges for storing and handling grain. SLT filled out this form, but showed only its charges to Howe Grain, explaining: "This is the schedule of charges for our customer Howe Grainery for our field warehouse service." Another document submitted in conjunction with SLT's application was a form for ordering warehouse receipts from the Department. SLT ordered no such forms. In their brief, SLT and Federal assert this was because the warehouse receipts supplied by the Department were appropriate only for stored grain obtained from a grain producer, whereas SLT would be issuing receipts only to the Bank as a lender, and the Department's receipts did not contain provisions appropriate for the financing arrangement between Howe Grain and the Bank.

The rights and obligations between Howe Grain and SLT pertinent to the issues we must resolve are documented in five instruments executed by those parties on August 29, 1979. Two of those instruments were field warehouse leases in which Howe Grain was lessor and SLT was lessee. One lease pertained to the facility at Denton and the other pertained to the facility at Rives. The Rives lease covered four storage tanks and a building; the Denton lease covered nine storage tanks. Howe Grain maintained an office and a scale at each site. Neither lease covered either of the offices or scales.

The provisions of each lease were identical. They provided, in pertinent part:

"5. Lessor agrees that Lessee as a warehouseman is to have the sole dominion and control of said warehouse buildings ... and/or premises and the goods ... stored or to be stored therein ... and as such warehouseman is to be entitled at all times to receive and store goods ... in ... said leased buildings ... and/or premises and to issue warehouse receipts therefor....

6. It is expressly understood and agreed ... between Lessor and Lessee that Lessor shall not have access to the warehouse buildings ... and/or premises herein demised or any part thereof except with the permission of Lessee in writing, and that Lessor shall not exercise at any time any control of any sort over any of the goods ... against which warehouse receipts have been or shall be issued by Lessee during the term of this lease. However, Lessee may from time to time return to Lessor for Lessor's temporary use such portions of the demised premises not then required by Lessee. It is understood and agreed that the Lessee shall at all times have the right to occupy all of the demised premises, or such part thereof, as in the sole discretion of Lessee shall be required to meet Lessee's requirements."

Copies of the leases were recorded in the offices of the Recorders of Pemiscot and Dunklin Counties, as Denton is situated in the former county and Rives in the latter.

Another of the instruments executed August 29, 1979, was a collateral control agreement in which Howe Grain was denominated "Customer." That document provided, in pertinent part:

"2. Customer owns or controls ... and agrees to furnish to SLT warehouse buildings ... and/or premises sufficient in number and capacity to provide adequate storage space for goods ... to be warehoused by SLT.... It shall be the obligation and responsibility of Customer to physically move inventory into and out of the warehouse area, and to perform any physical movement of or handling of

inventory and equipment within the warehouse area....

....

5. SLT agrees to maintain a warehouse in ... said buildings ... and/or premises so leased by Customer to SLT and agrees to issue its warehouse receipts upon goods ... which Customer may store or cause to be stored in ... said leased buildings ... and/or premises.

6. Customer shall furnish to SLT two or more agents, as required by SLT, to permit SLT to operate its field warehouse...."

The other two documents executed August 29, 1979, by Howe Grain and SLT were "Articles of Agreement with Agent." In one of the documents SLT appointed Clarence E. Williams its agent at the two field warehouses; in the other document SLT appointed Vivian N. Howe its assistant agent at the field warehouses. In each document Howe Grain agreed that the compensation of the agents would be included in the charges to be paid by Howe Grain to SLT.

An "internal SLT memo" dated November 7, 1979, stated:

"... our agent at the [Howe Grain] account is the brother in law of Henry Howe who is the President of the corporation, his name is Clarence Williams and he ... came to work approximately 8 to 10 months ago.... Our asst. agent at this account is Vicki Howe and she has been our asst. agent since the time we installed the operation sometime back and she is the wife of the President, Henry Howe. We have two locations here with this account ... and they are located approximately three miles apart. The main office would be at Rives, Missouri and Williams communicates back and forth at the present time.

....

There is just not any other personnel around that could fill the function of being our agents...."

It was stipulated that "Vickie Howe"—inferably the same person as Vivian N. Howe named in the agent agreement of

August 29, 1979, and Vicki Howe named in the memo of November 7, 1979—was secretary-treasurer of Howe Grain. As agents of SLT, the duties of Clarence Williams and Vickie Howe were to issue warehouse receipts in favor of the Bank when requested by Henry Howe, ascertaining that there was sufficient grain in storage to support the amounts listed on the receipts. It was further stipulated that Vickie Howe and Clarence Williams were also agents of Howe Grain, and in that capacity their duties included weighing grain, issuing scale tickets, paying for grain and delivery of grain.

During the term of the field warehouse leases quoted from earlier, SLT posted the following signs at the Denton and Rives facilities.

At scalehouse:

"NOTICE

ALL GRAIN DELIVERED TO

THIS FACILITY SHALL BE

CONSIDERED SOLD AT

THE TIME OF DELIVERY."

At scalehouse:

"SPACE ON THESE PREMISES

LEASED TO

SLT WAREHOUSE

COMPANY

ST. LOUIS, MO."

On storage bins:

"NOTICE

All commodities in or upon these premises in the custody of

SLT WAREHOUSE

COMPANY

ST. LOUIS, MO."

It was stipulated that the Department issued SLT a public grain warehouse li-

cense on March 26, 1980, which was subsequently posted at the Rives facility.

Later in 1980 the General Assembly of Missouri repealed §§ 276.500–.565, RSMo 1978, pertaining to grain dealers, and enacted in lieu thereof 36 new sections numbered 276.401–.581, RSMo Supp. 1980. Laws 1980, S.C.S.H.B. 1627, pp. 340–53. Section 276.401, RSMo Supp. 1980, contained this definition:

"(9) **'Grain dealer'** or **'dealer'**, any person engaged in the business of, or as a part of his business participates in, buying grain."

On November 14, 1980, an official of the Department wrote Henry Howe of Howe Grain stating, in pertinent part:

"The 80th General Assembly ... repealed the Missouri grain dealer's law ... and enacted, in lieu thereof, a new grain dealer's law which became effective August 13, 1980.

... under the present (new) law all warehouses ... that buy grain in the state of Missouri are required to obtain a Missouri grain dealer's license. This is in addition to your warehouse license (which must be maintained to store grain for others). As a licensed grain dealer you will be required to obtain a grain dealer's bond. Your current warehouse bond covers only storage grain while the grain dealer's bond will cover grain purchases...."

It was stipulated that the Department did not send SLT a similar letter because the Department did not have any evidence that SLT had any direct contact with anyone selling or delivering grain to the Howe Grain facilities. A telephone slip in the Department's records noted a call concerning Howe Grain and states: "Howe Grain, Inc. buys the grain. SLT leases space only."

The Department never required SLT to become licensed as a *grain dealer*. The Department did, however, renew SLT's *public grain warehouse license* on April 24, 1981. The license, as renewed, stated, in pertinent part:

"This Warehouse is Bonded in the Amount of $161,000.00 ...

THIS CERTIFIES, That SLT Warehouse Company[,] City of St. Louis, ... State of Missouri, is hereby granted license to operate a Public Grain Warehouse at SLT Warehouse Company, Denton and Rives in the ... State of Missouri ...

Said warehouseman is authorized to store not in excess of 429,000 bushels at any one time."

In regard to the $161,000 bond referred to in the license, SLT, as principal, and Federal, as surety, had executed a "Public Grain Warehouseman's Bond" on March 31, 1981, to become effective April 23, 1981. It provided, in pertinent part:

"... SLT ... and Federal ... are jointly and severally held and firmly bound unto the State of Missouri for the benefit of all persons, firms, corporations or associations interested, or to their legal representatives, attorneys, or assigns, in the penal sum of [$161,000] ... for the payment of which ... we bind ourselves, our heirs, executors, administrators, legal representatives, successors and assigns firmly by these presents.

The conditions of the above obligation are such that, whereas, [SLT] has made written application to the Director ... for a license to engage in business as a public grain warehouseman and operate the SLT Warehouse Company elevator as a public warehouse at Denton and Rives ... Missouri.

Now, therefore, if [SLT] shall faithfully perform all of the duties of a licensed public warehouseman, in conformity with the provisions of the Missouri Grain Warehouse Law (Chap. 411 RSMo) and the rules and regulations promulgated thereunder, and all additional obligations as said [SLT] may assume under contracts with persons storing grain in the warehouse, then this obligation shall be void, otherwise to remain in full force and effect during the term of the license and its extension or annual renewals.

....

The provisions of the Missouri Grain Warehouse Law (Chap. 411 RSMo.) relating to public warehouse surety bonds are

hereby made applicable to this instrument and the parties hereto and are incorporated herein by reference."

Section 411.275, RSMo Supp. 1980, which was in effect at the time the above bond was issued, provided:

"1. Before any person is granted a license pursuant to ... this chapter, the person shall give a bond ... to the director executed by the warehouseman as principal and by a corporate surety.... The bond shall be in favor of the state of Missouri for the benefit of all persons interested, their legal representatives, attorneys, or assigns, conditioned for the faithful performance of all his duties as a public warehouseman, and all additional obligations as may be assumed by the warehouseman under contracts with persons storing grain in the warehouse. Notwithstanding any other provisions of this chapter, the bond provided shall cover all grain deposited with a licensed warehouseman, whether under open storage or warehouse receipts.

...."

On February 1, 1982, the Department issued a *grain dealer's* license to Howe Grain. At that time, § 276.426, RSMo Supp.1980, provided:

"1. Every person licensed as a grain dealer shall have filed with the director a surety bond executed and signed by the grain dealer as principal and issued by a responsible corporate surety licensed to execute surety bonds in the state of Missouri....

2. Such bond shall be made payable to the state of Missouri ... with the director as trustee for the benefit of all persons selling grain to the grain dealer and shall be conditioned upon the following:

(1) The dealer as a buyer paying to the seller the agreed-upon cash price or contract price of the grain purchased from the seller;

(2) The grain dealer's faithful performance of his duties as a licensed grain dealer and his compliance with [chapter 276]...."

In obedience to the above requirements, Howe Grain, as principal, and State Surety Company ("State Surety"), as surety, executed a "Grain Dealer's Bond" effective February 1, 1982, which provided, in pertinent part:

"... Howe Grain ... as Principal, and State Surety ... as Surety, are jointly and severally held and firmly bound unto the State of Missouri for the benefit of all persons, firms, corporations or associations interested, or to their legal representatives, attorneys, or assigns, in the penal sum of [$59,000] ... for the payment of which ... we bind ourselves, our heirs, executors, administrators, legal representatives, successors and assigns firmly by these presents.

The conditions of this obligation are such, that if the said Grain Dealer faithfully performs all of the duties of a licensed grain dealer and complies with all the provisions of 'The Missouri Grain Dealer's Law', Chapter 276 ... RSMo, then this obligation is void; otherwise it remains in full force."

On May 28, 1982, SLT executed quitclaim deeds to Howe Grain, wherein SLT surrendered its leasehold interests in the premises at Denton and Rives. That same date SLT cancelled the collateral control agreement of August 29, 1979.

On June 2, 1982, SLT's senior vice president sent a letter to an official of the Department stating, in pertinent part:

"... we have ... terminated our operations [at Denton and Rives] and picked up our licenses, which we now enclose. There are no further outstanding Receipt Holders, and we have no grain at the warehouse.

You may feel free to schedule your Auditors at any time, and insofar as we are concerned, we consider our operation at these two locations terminated. We have mailed out to our former Customer, Howe Grain ... Releases of our Leases at these two locations."

On June 4–7, 1982, a Department auditor conducted an examination of the Denton and Rives facilities in connection with Howe Grain's grain dealer's license and

"the closeout of the SLT Warehouse license." At the time of the audit the Howe Grain facilities were empty of grain.

Following the audit, the Department issued a discrepancy report to Howe Grain stating, among other things:

"... the Missouri Grain Warehouse Law and ... the Missouri Grain Dealers Law states that deferred price contracts shall be in writing and shall contain a statement informing the seller that the seller is relinquishing all rights in the grain, that the buyer is not required to carry bond on the grain for the benefit of the seller, and that the payment for the grain becomes a common claim against the buyer.

It was noted during the course of this exam that all the above requirements are not included in your present contracts. Therefore, you are requested to complete valid contracts as outlined above for the present delayed price grain, have the contracts properly signed and mail a copy of the contracts to the [Department] ... by June 22, 1982."

After SLT surrendered its public grain warehouse license, Howe Grain applied for a public grain warehouse license. The Department conducted an investigation regarding Howe Grain's application. The report of that investigation, which was completed July 13, 1982, showed that the warehouse was empty, and that it had also been empty at the end of June, 1982.

On July 12, 1982, the Bank filed suit in the Circuit Court of Dunklin County against SLT and Clarence Williams. The Bank's petition alleged, among other things, that on January 27, 1982, SLT had issued a warehouse receipt indicating there were 155,000 bushels of soybeans in Howe Grain's elevator with an estimated value of $1,162,500, and that in reliance thereon the Bank had loaned substantial sums to Howe Grain. The petition further alleged that the loan had matured on or about April 27, 1982, that after the sale of the soybeans held in storage by SLT, SLT was unable to account for approximately 62,500 bushels having an approximate value of $375,000, and that the balance of indebtedness of

Howe Grain to the Bank was in an amount exceeding the value of the shortage of soybeans. The Bank prayed for judgment against SLT for $375,000 plus interest and costs.

On July 26–30, 1982, the Department conducted another audit of Howe Grain. A discrepancy report was issued, again noting that the Howe Grain delayed pricing contracts did not meet statutory requirements. The report also stated:

"Due to your delayed pricing contracts being deemed invalid, the grain represented by these contracts has been converted to an open storage obligation. As you have already shipped the grain and sold it ... this causes a company-owned minus position of your Wheat stocks in the amount of 3,603.73 bushels and a minus position of your SBean stocks in the amount of 8,974.20 bushels.

It will be necessary for you to correct these ... minus positions by completing one of, or a combination of, the following transactions.

a) Purchase and make actual payment for the necessary bushels of each grain from an outside source,

b) Purchase and make actual payment for all of the invalid contracts now existing, OR,

c) Have each customer sign an approved, revised delayed pricing contract!"

On August 25, 1982, the Department filed a complaint seeking revocation of Howe Grain's grain dealer's license.

On October 4, 1982, the Director of the Department issued an order revoking the Missouri grain dealer's license of Howe Grain effective immediately. The order included findings of fact and conclusions of law. The findings of fact included this:

"... Howe Grain ... purchased grain ... from a number of farmers or farming concerns, and issued checks in payment for these grain purchases.... A large number of these checks have been presented for payment and dishonored.... The farmers or farming concerns which received these ... checks for their grain sold to Howe Grain ... have

not received payment for their grain from Howe Grain ... in any other manner."

The total amount of the insufficient funds checks exceeded $112,000. The Director, in his conclusions of law, determined that Howe Grain was insolvent under the statutory definition in § 276.401(11), RSMo Supp.1981, which provided:

" 'Insolvent' or 'insolvency', (a) an excess of liabilities over assets or (b) the inability of a person to meet his financial obligations as they come due, or both (a) and (b)[.]"

Howe Grain filed a voluntary petition in bankruptcy in the United States Bankruptcy Court, Eastern District of Missouri, October 20, 1982.

The Department, through auditors, solicited and accepted claims from producers who had delivered grain to Howe Grain and had not been paid. The Department classified the claims in three categories: (1) open storage accounts, (2) claims for grain delivered and priced but not paid, and (3) producers who received insufficient funds checks for grain delivered and sold.

On October 18, 1982, the Department sent State Surety a letter stating, in pertinent part:

"Please consider this letter as the formal ... demand of the Missouri Department of Agriculture and its Director ... on the [grain dealer] bond [of Howe Grain], that the full value of the ... bond be paid to the Department and its Director, for distribution in an interpleader or other appropriate court action ... to appropriate grain dealer claimants of Howe Grain....

Enclosed with this letter you will find a listing of each of the individuals or entities having a grain dealer claim against the bond of Howe Grain.... From this ... list it should be apparent to State Surety ... that a sum substantially in excess of $59,000 is owing to the grain dealer claimants specified. In order to expedite the payment of these

claims at the least possible cost to State Surety ... we suggest payment of this sum to us immediately for deposit into Court and distribution pursuant to Court Order...."

State Surety paid the sum demanded to the Director on December 8, 1982.

On April 11, 1983, the Attorney General of Missouri sent a letter to SLT stating, in pertinent part:

"By operation of law, 411.325.2 RSMo Supp.1982, the grain priced but unpaid and grain 'paid' for by means of insufficient funds checks became storage obligations of SLT and SLT's bond required under 411.275 RSMo Supp.1982, is applicable. Additionally, those persons whose grain was stored and unpriced at SLT's warehouse also have claims against SLT."

The letter listed claims presented to Department auditors as claims against SLT. The letter concluded: "Please consider this letter as a formal claim against SLT...." A copy of the letter was sent to Federal.

SLT and Federal declined the invitation to pay any part of their $161,000 bond to the Director.

On June 28, 1983, the Director commenced the instant action by filing a two-count petition in the Circuit Court of Dunklin County.[2] Count I concerned the $59,000 paid to the Director by State Surety on the grain dealer's bond. Count I identified: (a) 10 claimants holding "storage accounts" against Howe Grain, the aggregate amount exceeding $22,000, (b) 14 claimants presenting claims against Howe Grain for "grain delivered and priced but not paid," the aggregate amount exceeding $68,000, and (c) 19 claimants who had received insufficient funds checks from Howe Grain for grain delivered by them to it, the aggregate amount exceeding $141,000. All of the claimants were named as defendants, along with SLT, Howe Grain, State Surety, and Federal. Count I prayed that the defendants be required to interplead with each other "to determine which is entitled to receive payment and the amount there-

2. The case was subsequently transferred to Stoddard County on change of venue.

of," and for an order discharging the Director from all further responsibility under Count I except for disbursing the $59,000.

Count II averred, among other things, that under § 411.325.2, RSMo Supp.1980,[3] all grain received at a licensed public grain warehouse becomes, by operation of law, storage grain unless actual payment for same is received within specified time periods or an agreement complying with § 411.325.4, RSMo Supp.1980, is executed. Count II further alleged that no agreements per § 411.325.4 were executed and that much of the grain deposited with SLT at Denton and Rives was not paid for within the periods specified in § 411.325.2. Consequently, pled Count II, all of the grain deposited with SLT at Denton and Rives that was not paid for within the statutory periods became storage grain by reason of § 411.325.2. Count II prayed for an order directing Federal to deposit the amount of its grain warehouse bond, $161,-000, with the trial court, and for an order to the defendants to interplead with each other to determine who was entitled to receive payment and the amount thereof.

A stipulation filed in the trial court June 19, 1985, provided, among other things:

"The [Director] has classified claims into three categories: (1) storage, (2) priced/unpaid; and (3) insufficient funds checks. In the [Director's] opinion ... those claims classified by him as 'Storage', relate to the public grain warehouse bond issued on behalf of SLT. The other two classifications, priced/unpaid and insufficient funds checks, relate to the grain dealer's bond issued on behalf of Howe Grain."

The stipulation disclosed that SLT had paid the Bank $275,000 in settlement of the Bank's suit against SLT arising out of the shortage of grain to cover the warehouse receipts.

While the case was pending in the trial court, it was brought to that court's attention that a case was pending in the Supreme Court of Missouri—*State ex rel. Neese v. IGF Insurance Co.*—that might have a bearing on the instant case. The trial court thereupon deferred its decision until the Supreme Court's ruling in *Neese,* which was handed down March 25, 1986. The opinion appears at 706 S.W.2d 856.

The trial court, adjudicating the case without a jury, entered judgment November 16, 1987, accompanied by a written opinion. The opinion said, among other things:

"The claims against [State Surety's grain dealer's bond] are classified as: (1) storage, (2) priced, delivered, but unpaid, and (3) insufficient funds checks. The two latter classes are covered by the grain dealer's bond. The first class is not covered because the storage transactions were not a part of the business of buying grain....

... the construction of Chapter 411, RSMo ... by the Supreme Court in [*Neese*] leads to the conclusion that by obtaining the warehouseman's license and bond and doing business under the license, SLT obligated itself and its surety to pay the claimants who are within the three classifications. Said case further implies that the fact a transaction was covered by a grain dealer's bond does not necessarily exclude coverage of the transaction by the warehouseman's bond, and the court is of the opinion that the coverage in this case is not exclusive...."

Therefore, judgment should be rendered in favor of [the Director] and against ... SLT and Federal ... in the

**3.** Section 411.325.2, RSMo Supp. 1980, provided:

"All grain received at a licensed warehouse shall be deemed to be storage grain within the meaning of this chapter, unless:

(1) Actual payment for the grain is made upon delivery to the warehouseman; or

(2) At the time of delivery of the grain to the warehouseman, the actual purchase price is established and properly documented and actual payment made within thirty days thereafter or the account is entered onto a formal settlement sheet. If an account is entered onto a formal settlement sheet, actual payment shall be made within one hundred eighty days of delivery or the account shall be moved to a formal written contract as provided for in subsection 4 of this section."

amount of $161,000.00, together with interest at the rate of nine percent per annum from the date of demand. The proceeds should be distributed to the parties named in the judgment in the amount of their pro rata share of the entire proceeds from the warehouseman's bond."

With respect to Count I, the judgment apportioned the $59,000 from the grain dealer's bond, together with the interest those proceeds had earned since December 8, 1982, among 30 claimants having claims for grain "priced, delivered, but unpaid" (category 2), or claims for grain paid for by insufficient funds checks (category 3), or both. Apportionment was pro rata, based on the amount of each claim.

With respect to Count II, the judgment apportioned the $161,000 from the public grain warehouse bond, together with interest at nine per cent per annum since demand April 11, 1983, among 39 claimants having claims in all three categories. Thirty of those claimants had been allowed claims against the grain dealer's bond by the segment of the judgment pertaining to Count I. The claims allowed per Count II, like those allowed per Count I, were ordered paid pro rata.

SLT and Federal (henceforth referred to collectively as "appellants") appeal from the part of the judgment pertaining to Count II. No other party appealed from any portion of the judgment.

Appellants, in the first of their five assignments of error, maintain the trial court erred in holding them liable on the public grain warehouseman's bond in that SLT was a field warehouseman to Howe Grain and was not a public grain warehouseman with respect to the claimants holding claims against Howe Grain. Appellants emphasize that under the collateral control agreement between SLT and Howe Grain, only grain belonging to Howe Grain was to be stored in the leased facilities, that SLT did not hold itself out as being in the grain storage business, did not advertise for or accept grain from grain producers for storage, and did not issue any scale tickets or deferred pricing agreements to grain producers. In appellants' words: "[T]he issue is whether SLT utilized the leased tanks to store public grain. It did not. SLT simply certified to the ... Bank that Howe Grain had its own grain in its own storage tanks."

Appellants further argue under their first point that even if it is found that SLT stored Howe Grain's grain, SLT is accountable only to Howe Grain, and not to those holding claims against Howe Grain. Appellants assert it is Howe Grain who is responsible to the claimants, while SLT was responsible only to the Bank and has fulfilled that obligation.

The Director responds that the reason for insisting that SLT be licensed as a public grain warehouseman was that SLT was storing Howe Grain's grain at Denton and Rives, that SLT exercised dominion and control over the stored grain, and that SLT thereby fit the statutory definition of a public warehouse. In that regard, § 411.026, RSMo Supp.1981, which became effective June 10, 1981, Laws 1981, S.B. 366, pp. 608–11, contained these definitions:

"(22) 'Public warehouse', a warehouse used for the purpose of storing grain of owners other than the warehouseman for compensation received directly or indirectly, whether grain of the owners be commingled or whether identity of different lots be preserved, or a warehouse used for any purpose for which a license is required under section 411.255;

(23) 'Public warehouseman', any person owning or operating a public warehouse...."

Section 411.255, RSMo 1978, referred to in § 411.026(22) above, provided:

"1. No person shall

(1) Operate a warehouse for storage of grain for compensation, received directly or indirectly;

....

(5) ... without first obtaining and keeping in force an annual license issued by the department authorizing the operation of a public grain warehouse[.]" .

The Director points out that under paragraph 5 of the field warehouse leases,

quoted earlier, SLT, as a warehouseman, was given sole dominion and control of the leased premises and the grain stored therein, and under paragraph 6 of the leases, also quoted earlier, Howe Grain was to have no access to the leased premises except with permission of SLT. Furthermore, says the Director, appellants, in their answer to Count II of the Director's petition, admitted that SLT exercised control over the leased premises and the grain therein covered by warehouse receipts issued by SLT. Additionally, the Director reminds us that the sign on the storage bins stated that all commodities in or upon such premises were in the custody of SLT.

The Director concedes that SLT would not have been operating a public grain warehouse had SLT been storing its own grain. However, asserts the Director, SLT stored grain it did not own, and this is what required a public grain warehouseman's license. In the Director's words: "Strictly from the point of view of the need for licensure, it didn't make any difference if the grain belonged to Howe Grain or to the producers. What mattered was that the grain didn't belong to SLT."

■ We agree with the Director, and hold that under the definition of public warehouse in § 411.026(22), RSMo Supp. 1981, quoted earlier, SLT, by using the premises it occupied as lessee to store grain placed in its custody by Howe Grain —for which SLT was undeniably compensated by Howe Grain—was operating a public grain warehouse as statutorily defined. It is true, of course, that Howe Grain was not obliged to place in SLT's custody all grain acquired by Howe Grain. Only if Howe Grain wished to use grain for collateral to obtain loans from the Bank was Howe Grain required to place grain in SLT's possession. The fact remains, however, that Howe Grain did place grain it acquired from producers in SLT's custody for storage and issuance of warehouse receipts, and Howe Grain compensated SLT for such services. That grain, contrary to appellants' argument, was not stored by Howe Grain in its own tanks. It was stored by SLT as field warehouseman in premises occupied by SLT as leaseholder. Appellants' first point is denied. That does not mean, however, that appellants are automatically liable to the claimants listed in the judgment. That subject is discussed in our consideration of appellants' second point.

That point alleges the trial court erred in holding appellants liable to the claimants in that Howe Grain held title to any grain stored with SLT, and the claimants' *sale* of such grain to *Howe Grain* cannot be converted by operation of law to *storage* of such grain with *SLT*. Appellants emphasize that the Department separated the claims against Howe Grain into three categories, "storage," "priced/unpaid," and "insufficient funds checks." The Department's original premise, say appellants, was that only the claimants holding "storage" claims against Howe Grain were covered by the public grain warehouseman's bond, while the claims in the "priced/unpaid" category and the "insufficient funds checks" category were covered by the grain dealer's bond signed by Howe Grain and State Surety. According to appellants, it was only after the Supreme Court's decision in *Neese,* 706 S.W.2d 856, that the Department contended all three categories of claims were covered by the public grain warehouseman's bond.

It is imperative that we keep in mind that if appellants be liable *in this suit* to any of the claimants, such liability exists solely under the public grain warehouseman's bond executed by appellants March 31, 1981. Whether SLT might be liable to the claimants, or any of them, on some other basis is a subject not before us in this appeal, as this case is a suit by the Director to obtain the amount of the bond for apportionment between claimants whose claims are covered by the bond. There is no contention by anyone that appellants are liable to Howe Grain under the public grain warehouseman's bond, and Howe Grain, which was a party to this suit, was awarded nothing against appellants by the trial court's judgment. Howe Grain has not appealed.

It is likewise essential to remain aware that appellants' liability on the public grain

warehouseman's bond must be determined from that instrument and the Missouri Grain Warehouse Law, chapter 411, RSMo 1978, as amended. SLT was *not* licensed as a *grain dealer* under §§ 276.401–.581, RSMo Supp. 1980, and there was never any contention in this suit that SLT engaged in business as a grain dealer.

Finally, there was no contention that SLT and Howe Grain, by reason of employing the same individuals as agents (Clarence Williams and Vivian Howe) and conducting their respective businesses at the same sites at Denton and Rives, became the alter egos of each other. To the contrary, the Department recognized SLT and Howe Grain as separate entities by requiring SLT to be licensed as a public grain warehouseman and Howe Grain to be licensed as a grain dealer. SLT and Federal were principal and surety, respectively, on the public grain warehouseman's bond, while Howe Grain and State Surety were principal and surety, respectively, on the grain dealer's bond.

The Director's contention that the claims of the claimants are covered by the public grain warehouseman's bond is based on § 411.325, RSMo Supp. 1980, which was in effect at all times material herein. Paragraph 1 of that section provided:

"At the time of delivery of grain to any public warehouse the scale ticket shall be marked to indicate whether the grain is delivered for storage, for sale or for some other purpose."

Paragraph 2 of § 411.325, RSMo Supp. 1980, is quoted in footnote 3, *supra*, and should be reviewed. Paragraph 4 of § 411.325, RSMo Supp. 1980, provided:

"Notwithstanding any provisions of this section, a licensed warehouseman and a depositor may agree that payment or pricing of the depositor's grain be deferred to a future date. The agreement shall be in writing and shall contain a statement informing the seller that the seller is relinquishing all rights in the grain, that the warehouseman is not required to carry bond on the grain for the benefit of the seller and that the payment for the grain becomes a common

claim against the warehouseman. The director may require any additional information from a warehouseman that he deems necessary to protect the interests of the seller of grain in these transactions. Grain received under a deferred payment or deferred pricing agreement under the provisions of this section shall not be deemed to be stored grain. Any amount paid to or charged by the warehouseman under a deferred payment or deferred pricing agreement, whether designated as a service charge, storage fee or otherwise, shall be deemed to be compensation within the meaning of this chapter."

The obvious purpose of § 411.325 was to ensure that anyone depositing grain in a licensed public grain warehouse would be protected to the maximum extent possible by the public grain warehouseman's bond required by § 411.275, RSMo Supp. 1980, quoted earlier in the text of this opinion. Section 411.325 attempted to accomplish that goal by providing in paragraph 2 (footnote 3, *supra*) that all grain received at a licensed warehouse would be deemed storage grain (which would, of course, be covered by the bond) except in certain specific situations. The first situation (set forth in subdivision (1) of paragraph 2 of § 411.325) was where payment was made upon delivery of the grain to the warehouseman. In that situation the depositor would not need the protection of the bond because he would have been paid for his grain. The second situation (set forth in subdivision (2) of paragraph 2 of § 411.325) was where the purchase price was established and documented at time of delivery of the grain, and actual payment was made within 30 days thereafter or the account was entered on a formal settlement sheet. If the account was entered on a formal settlement sheet, actual payment was to be made within 180 days of delivery or the account was to be moved to a formal written contract as provided in paragraph 4 of § 411.325. Paragraph 4, as we have learned, required that the contract inform the seller that he was relinquishing all rights in the grain, that the warehouseman was *not* required to carry bond on the grain for the benefit

of the seller, and that payment for the grain became a common claim against the warehouseman.

It is clear under subdivision (2) of paragraph 2 of § 411.325 that if the purchase price was established at the time the grain was delivered to the public warehouseman, and payment was not made within 30 days thereafter, the grain became storage grain by operation of law and, as storage grain, would be covered by the public grain warehouseman's bond. There was an exception, however, if the account was entered on a formal settlement sheet. In that event payment was to be made within 180 days of delivery or the account was to be moved to a formal written contract per paragraph 4 of § 411.325. Under a contract of that type, the grain would not be deemed storage grain, and consequently would not be covered by the public grain warehouseman's bond.

The Director's theory that the claimants' grain is covered by the public grain warehouseman's bond is that inasmuch as (a) the claimants were not paid in cash by Howe Grain at time of delivery, (b) the claimants were not paid by Howe Grain within the periods prescribed by subdivision (2) of paragraph 2 of § 411.325, and (c) no written contracts meeting the specifications of paragraph 4 of § 411.325 were executed by Howe Grain and the claimants, title to all of the grain delivered by the claimants to Howe Grain never passed from the claimants to Howe Grain. Consequently, says the Director, SLT, in storing such grain, was storing grain belonging to the several claimants, not to Howe Grain. Thus, according to the Director, all of the claimants' grain was storage grain covered by appellants' public grain warehouseman's bond.

The flaw in the Director's premise is that paragraphs 2 and 4 of § 411.325 apply only to grain delivered to a licensed public grain warehouse. Claimants delivered their grain to Howe Grain, which was never licensed to operate a public grain warehouse. The only license ever issued by the Department to Howe Grain was a grain dealer's license per §§ 276.401–.581, RSMo

Supp. 1980. Consequently, paragraphs 2 and 4 of § 411.325 never applied to the deliveries of grain by claimants to Howe Grain, and thus could not provide a vehicle by which title to such grain remained in claimants or reverted to them.

It must also be understood that § 411.325 does not create any liability against a public grain warehouseman. All the statute does is provide that grain received at a licensed public grain warehouse is deemed storage grain unless (a) the depositor is paid within the times specified in the statute or (b) a written agreement complying with paragraph 4 of such statute is executed by warehouseman and depositor.

It is evident, of course, that all grain delivered by Howe Grain to SLT was, as between those parties, never anything other than storage grain. All parties agree that there was never any intent by Howe Grain to sell any grain to SLT, nor was there ever any intent by SLT to purchase any grain from Howe Grain. All grain deposited with SLT by Howe Grain was to be held in storage by SLT until such time as the Bank authorized SLT to release it to Howe Grain. The issue is not whether such grain was storage grain, but instead whether it was storage grain for which appellants are liable to claimants under appellants' public grain warehouseman's bond.

It must be borne in mind that so far as the record shows, none of the claimants' grain—or anyone else's for that matter—was in the hands of SLT when SLT surrendered possession of the leased premises to Howe Grain on May 28, 1982. Additionally, nothing in the record suggests that SLT, prior to surrendering possession of the leased premises, was aware that anyone except Howe Grain and the Bank had any claim to any grain that had ever come into SLT's possession. Furthermore, there is no contention that SLT ever surrendered possession of any grain to anyone other than Howe Grain, the party from whom SLT had received the grain. It was only after SLT had parted with all grain in its possession that SLT was put on notice that others claimed rights in such grain.

The procedure followed by the Bank, SLT and Howe Grain regarding grain delivered by Howe Grain to SLT and stored by the latter as field warehouseman is illustrated by documents in the file regarding the 155,000 bushels of soybeans mentioned in the Bank's suit against SLT. SLT issued a "nonnegotiable" receipt verifying it had received the soybeans from Howe Grain for *storage.* That SLT was not purchasing such grain is confirmed by the following clause on the face of the receipt: "... SLT ... has no financial interest in the above described merchandise except for its contractual and statutory lien for payment of charges...." Release of grain delivered by Howe Grain to SLT as field warehouseman was accomplished by a document captioned "Withdrawal Record." Such document authorized release by SLT of a specific quantity of grain to Howe Grain, and was signed by an officer of the Bank as "Document Holder." The record contains withdrawal authorizations executed by Bank officers authorizing release to Howe Grain of more soybeans than the 155,000 bushels evidenced by the above-mentioned receipt.

Section 411.491, RSMo 1978, which was in effect at all times material herein, provided:

"A warehouseman, in the absence of some lawful excuse provided by this chapter, is bound to deliver the grain upon demand made either by the holder of a receipt for the grain, or by the depositor, if the demand is accompanied with:

(1) An offer to satisfy the warehouseman's lien;

(2) An offer to surrender the receipt, if negotiable, with such endorsements as would be necessary for the negotiation of the receipt; and

(3) A readiness and willingness to sign, when the grain is delivered, an acknowledgement that it has been delivered, if an acknowledgement is requested by the warehouseman. In case the warehouseman refuses or fails to deliver the grain in compliance with the demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for his refusal."

Howe Grain was, of course, a depositor[4] of grain with SLT.

It is manifest under § 411.491 that upon presentation by Howe Grain to SLT of documents executed by officials of the Bank authorizing release by SLT to Howe Grain of grain stored with SLT by Howe Grain, and for which SLT had issued warehouse receipts, SLT was compelled to release such grain to Howe Grain upon demand.

While the Bank's petition in its suit against SLT averred that SLT was unable to account for 62,500 bushels of soybeans, there was no showing in the instant case that SLT ever delivered any grain to anyone except Howe Grain, the party from whom SLT received it, and, as noted earlier, the record contains written authorization from the Bank to release more soybeans than the 155,000 bushels shown on the warehouse receipt mentioned in the Bank's suit.

■ In sum, there is no showing that SLT ever released any grain otherwise than as authorized and required by § 411.491, and it is clear that SLT had released all grain in its custody prior to learning that anyone except Howe Grain or the Bank claimed any interest therein. In such circumstances, even if we assume that all of the claimants' grain was once in SLT's possession, we believe § 411.491 immunizes appellants from all claims against the public grain warehouseman's bond by the claimants herein.

A simple hypothetical illustrates our conclusion. Suppose a grain dealer, after receiving grain from sundry producers, stores it in a public grain warehouse operated by a third party several miles away. A week later the grain dealer returns to the warehouse, presents the receipt, and demands the grain, which is surrendered by the warehouse. The grain dealer sells

4. Section 411.026(7), RSMo Supp. 1981, which was in effect at all times material herein, defined "depositor" as "any person who deposits grain in a warehouse for storage, handling, shipment, processing, or who is the owner or holder of a warehouse receipt, or who is otherwise lawfully entitled to possession of the grain."

the grain but never pays the producers for it. Could it seriously be argued that the producers have any claim against the bond of the third party warehouseman? We believe that the answer under § 411.491 is clearly no.

We discern no difference between the hypothetical and the instant case. The claimants here never deposited any grain with SLT; they delivered grain to Howe Grain, and the scale tickets they received carried only the name of Howe Grain. It was Howe Grain, not the claimants, who deposited grain with SLT, and it was Howe Grain to whom SLT surrendered grain before any notice that anyone else claimed any interest in it. As emphasized earlier, there was no averment that SLT and Howe Grain were each other's alter ego so that in contemplation of law delivery of grain by claimants to Howe Grain would have been tantamount to deposit of grain by claimants with SLT. Whether such a theory could have been successfully pursued is not before us, and we express no opinion on the subject.

The public grain warehouseman's bond executed by appellants, quoted earlier in pertinent part, was conditioned on faithful performance by SLT of all of the duties of a licensed public grain warehouseman under chapter 411, RSMo, and all additional obligations as SLT might assume under contracts with persons storing grain in the warehouse. As observed earlier, SLT performed its lawful duty as a licensed public warehouseman under § 411.491, RSMo 1978, when it delivered to Howe Grain, upon demand by the latter properly documented, all grain placed by Howe Grain in storage with SLT. It is evident that SLT never assumed any obligations by contract with any claimant, as SLT never had any dealings with any claimant. Consequently, there was never an occurrence of any condition triggering liability to any claimant under appellants' public grain warehouseman's bond.

*Neese*, 706 S.W.2d 856, while involving a public grain warehouseman's bond, does not aid the Director. In *Neese* the grain producers delivered grain to a licensed public grain warehouseman, while in the instant case the grain producers delivered grain to Howe Grain, a licensed grain dealer, instead of to SLT, a licensed public grain warehouseman. Only Howe Grain deposited grain with SLT. Had SLT violated any duty owed by it as a public grain warehouseman to Howe Grain, the latter would presumably have had a claim against appellants on the public grain warehouseman's bond. However, as observed earlier, Howe Grain was awarded nothing by the trial court and Howe Grain has not appealed.

We need not, and do not, speculate as to what liability, if any, appellants would have had to claimants if SLT, prior to releasing all grain to Howe Grain, had been put on notice by claimants that they claimed an interest in such grain, or that they had delivered grain to Howe Grain for which they had never been paid. On the record before us, no such circumstances are shown.

For the reasons heretofore set out, we hold that none of the claimants' claims are covered by the $161,000 public grain warehouseman's bond executed by appellants. It is consequently unnecessary to discuss appellants' remaining points.

That portion of the judgment pertaining to Count I of the Director's petition is affirmed[5]; that portion of the judgment pertaining to Count II of the Director's petition is reversed.

HOLSTEIN, C.J., and GREENE, J., concur.

---

5. As recounted earlier, the trial court, in the portion of its judgment dealing with Count I of the Director's petition, held that the "storage" claims (category 1) were not covered by the grain dealer's bond executed by Howe Grain and State Surety. Neither the director nor any claimant appealed from that determination. We do not, in affirming the portion of the judgment pertaining to Count I, imply that the exclusion of the "storage" claims from coverage under the grain dealer's bond was correct.